# United States Court of Appeals
# for the Federal Circuit

_____

**JOHN R. MILDENBERGER, MICHELE C. RUTH,
ROBERT O. BARATTA, CAROL A. BARATTA,
JOSEPH K. HENDERSON,
PATRICIA T. HENDERSON, CHARLES C. CRISPIN,
JULIE D. CRISPIN, WILLIAM E. GUY, JR.,
STELLA S. GUY, JAMES J. HARTER,
PATRICIA C. HARTER, FLOYD D. JORDAN,
MARJORIE N. JORDAN, CHARLES V. LOCKE,
VERA A. LOCKE, ANN S. MACMILLAN,
PAUL PARE, ROBERT H. PARE, JR.,
ERYN T. PARE, JOHN F. PATTESON,
ROBERT PEARSON, FREDERICK RUTZKE,
KIMBERLY RUTZKE, BRIAN SCHMIDT,
DEBORAH SCHMIDT, MARK S. BEATTY,
ATHOL DOYLE CLOUD, JR., PATRICIA P. CLOUD,
MARK R. CONNELL, PHILIP TAFOYA,
AND GERALDINE TAFOYA,**
*Plaintiffs-Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

_____

2010-5084

_____

Appeal from the United States Court of Federal
Claims in case no. 06-CV-760, Judge Lynn J. Bush.

_____

Decided:  June 30, 2011

———————————

ROGER J. MARZULLA, Marzulla Law, of Washington, DC, argued for plaintiffs-appellants.  With him on the brief was NANCIE G. MARZULLA.

KATHERINE J. BARTON, Attorney, Appellate Section, Environment & Natural Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee.  With her on the brief were ROBERT DREHER, Acting Assistant Attorney General, and JUSTIN R. PIDOT, Attorney.

KEITH W. RIZZARDI, South Florida Water Management District, of West Palm Beach, Florida, for amicus curiae South Florida Water Management District.

———————————

Before BRYSON, GAJARSA, and LINN, *Circuit Judges.*

GAJARSA, *Circuit Judge.*

The issue before this court concerns the determination of when a takings claim accrues.  Appellants John R. Mildenberger, et al. (collectively, "Claimants") sued the United States ("Government") in the United States Court of Federal Claims seeking compensation for the alleged taking of their riparian and upland property rights. Because Claimants' alleged takings claims are barred by the statute of limitations in 28 U.S.C. § 2501 and Claimants failed to establish that Florida law recognizes compensable property interests in the riparian rights they allege were injured by the Government, we affirm the Court of Federal Claims' dismissal of their claims.

BACKGROUND

I.

Since the late 1800s, the State of Florida and the United States Army Corps of Engineers ("Corps") have constructed a system of canals, levees, and storage areas to control the water levels of Lake Okeechobee. In 1948, Congress authorized the Central and South Florida Project ("C&SF Project") to aid flood control, water conservation, prevention of saltwater intrusion, fish and wildlife preservation, and navigation. Flood Control Act of June 30, 1948, ch. 771, § 203, 62 Stat. 1175. The C&SF Project extends from Orlando, Florida to the Everglades and includes the Okeechobee Waterway. The Okeechobee Waterway connects the Atlantic Ocean and Gulf of Mexico via Lake Okeechobee, the St. Lucie River, and the St. Lucie Canal.

Although the St. Lucie River was originally a freshwater stream unconnected to the ocean, in 1892, private interests constructed a navigable passage linking it to the Atlantic Ocean. The mixing of the saline ocean water with the fresh river water made the St. Lucie River brackish and created an environment suitable for certain types of marine life. In 1924, to connect the St. Lucie River to Lake Okeechobee, the State of Florida built the St. Lucie Canal. As part of the C&SF Project, the St. Lucie Canal's depth and discharge capacity were increased to improve control over the water level in Lake Okeechobee. H.R. Doc. No. 643, 80th Cong. 2d Sess. at 36-37 (1948).

The Corps manages the level of Lake Okeechobee to meet its navigational, flood control, and other objectives. The Corps manages the lake's water levels in accordance with a regulation schedule, which is an official management policy that dictates when water is released from the lake based on the current water level and time of year.

When significant rainfall is anticipated, the Corps makes low-level releases from the lake pursuant to a "temporary planned deviation" from the regulation schedule. Supplemental Appendix ("S.A.") 138. Releasing water from the lake increases outflow to connected canals and waterways, including the St. Lucie Canal.

The St. Lucie Canal and St. Lucie River also receive water from other watersheds and canals that are not part of the C&SF Project. The water entering the St. Lucie River from both the C&SF Project and other sources is polluted by sediments and excess nutrients, such as phosphorus and nitrogen, that interfere with the St. Lucie ecosystem. Plans for restoring the balance of the ecosystem acknowledge that sediment, phosphorous, and nitrogen also enter the St. Lucie River from multiple sources.

In 1952, a local news organization reported that water released from Lake Okeechobee into the St. Lucie Canal had caused "irreparable damage." S.A. 294. Additionally, a Corps report regarding the St. Lucie Canal from 1957 noted:

> Local interests have contended for many years that the release of lake-regulation discharges through the St. Lucie Canal causes serious damage to fishing and boating in the St. Lucie estuary . . . . [T]he turbid fresh-water discharges replace the brackish water in the river and cause many fish to leave the area; that marine life unable to leave is killed by the fresh water; and that sediment carried by the releases is deposited in the estuary . . . .

> Past studies of the sedimentation problem in [the] St. Lucie Canal have concluded that (1) the release of turbid fresh water through the canal seriously affects sport fishing and other recreational

activities in the Stuart area; (2) during long discharge periods the salt water in the St. Lucie River is almost completely replaced by fresh water; (3) the releases carry fine sands, fragments of shell, and organic material into the St. Lucie estuary, much of which is deposited in the Palm City shoal; (4) an insignificant amount of sediment enters the estuary from uncontrolled drainage points and from the natural watershed of [the] St. Lucie River and its North and South Forks; (5) bank caving has contributed materially to the sediment load; and (6) in the mixing zone of fresh and salt water, the colloidal matter carried by the fresh water precipitates into a dark gray flocculent which settles to the bottom in places where there are low current velocities and little turbulence, and after reaching the bottom compacts gradually into a sticky clay deposit that resists subsequent removal by currents and turbulence more effectively than do sand, shell, or noncolloidal silts.

S.A. 233-40.

In 1970, a Wall Street Journal editorial noted that "the once-clear St. Lucie is black with mud, and Corps officials in Florida admit their agency is largely to blame. Nearly all the fish are gone. Gone, too, are most of the oysters, clams, pelicans, ospreys and wild ducks." S.A. 297. That year, an internal memorandum prepared by Colonel A.S. Fullerton of the Corps noted that the discharges through the St. Lucie Canal "erode the canal banks, fill the estuary with shoals, discolor the water, deny boating in the estuary, and drive out the fish." *Id.*

From 2004 through 2006, Lake Okeechobee experienced long periods of high water levels, stressing the dike

around the lake and prompting the Corps to release high volumes of water into the St. Lucie Canal. In 2004, state environmental officials warned people not to swim or fish in the St. Lucie River because of high bacteria levels. In 2005, due to algal blooms, the Martin County Department of Health banned swimming, fishing, and other contact with the St. Lucie River. The discharge of water from the lake reduced the salinity of the St. Lucie Canal to nearly zero, resulting in the death of oyster beds. The demise of the oyster beds also contributed to the decline of numerous other estuarine species including gastropods, crabs, sponges, fish, and birds. The amount of sea grass at the mouth of the St. Lucie River also substantially declined in 2006.

## II.

Claimants are twenty-two individuals who own property along the St. Lucie River and one individual who owns land abutting the St. Lucie Canal. On November 13, 2006, Claimants filed a complaint in the Court of Federal Claims seeking compensation of approximately fifty million dollars for the Government's "intentional and repeated discharge of pollutants" into the St. Lucie River and estuary system. Compl. 2. The Corps' releases of water allegedly took Claimants' "riparian right to use and enjoy the water in the St. Lucie River free from pollution," including their rights to swim, boat, fish, and use the water for recreation. *Id.* 12 ¶ 31, 13 ¶ 33. The complaint alleged that Lake Okeechobee has become laden with nutrients from agricultural activities. *Id.* 11 ¶ 28. These nutrients "concentrated in the Lake's waters, leading to its pollution and algae blooms and extreme turbidity." *Id.*

Additionally, the complaint alleges that the Corps' releases of large volumes of fresh water into the brackish water of the estuary "operate as a pollutant" because

"[f]resh water releases destroy the delicate balance between salt and fresh water so critical to a tidal estuary." *Id.* Claimants maintain that the Corps' periodic releases of polluted fresh water into the St. Lucie River have also "irrevocably altered the biochemical balance (including salinity levels) and character of the St. Lucie, degrading fish life and other marine organisms and critically needed vegetation." *Id.* 11 ¶ 29. The complaint also sought compensation for the alleged taking of upland property interests.

The Government filed a motion to dismiss and for summary judgment. Seven months later, the trial court requested supplemental briefing to address additional issues, including whether the "stabilization doctrine," under which a taking claim does not accrue until a continuous physical process set in motion by the Government has stabilized, applied to this case. J.A. 89. Claimants argued that the stabilization doctrine applies and that their claims accrued at the time of the Okeechobee releases in 2003 and 2005. The Government argued that the stabilization doctrine did not apply and that even if it did, the nature of the environmental harm caused by the water released into the St. Lucie River was apparent long before 2000.

The Court of Federal Claims granted the Government's motion to dismiss, ruling that Claimants' suit was filed outside the six-year statute of limitations applicable to claims for compensation under the Tucker Act, 28 U.S.C. § 1491. *Mildenberger v. United States*, 91 Fed. Cl. 217, 233 (2010). The trial court held that the stabilization doctrine applied for three reasons. First, neither of the parties proposed a potential date of claim accrual that did not depend on the doctrine. Second, the Government also failed to discuss how traditional accrual principles applied to the exclusion of the stabilization doctrine. Finally, the

trial court found the facts of *Northwest Louisiana Fish & Game Preserve Commission v. United States*, 446 F.3d 1285, 1290-91 (Fed. Cir. 2006) similar to those present in this case. *Id.* at 234.

The trial court applied the stabilization doctrine and found that "plaintiffs should have been aware of the permanence of defendant's discharges into the St. Lucie River long before November 13, 2000." *Id.* at 235. The court also determined that "the undisputed evidence presented by defendants demonstrates that the asserted environmental damage to the St. Lucie River had occurred and was in evidence almost fifty years before plaintiffs filed their complaint, and repeatedly occurred thereafter." *Id.* at 236. Finally, the court noted that any expectations Claimants had that the Government would mitigate the harm "arrived too late in face of a long-expired statute of limitations" and, therefore, did not prevent accrual of the claim. *Id.* at 239.

The Court of Federal Claims also granted summary judgment for the Government on alternative grounds. The trial court first held that Claimants' alleged riparian rights of fishing, swimming, boating, and recreation were not compensable rights because those rights are held in common with the public. *Id.* at 242. Additionally, the court rejected Claimants' asserted right to observe wildlife as unsupported by any legal authority. *Id.* at 242-44. The trial court further concluded that Claimants had not identified any cases applying Florida law to hold that the pollution of a navigable waterway by a governmental entity effected a compensable taking of property. *Id.* at 245-47. Moreover, the trial court found that any right of riparian owners to pollution-free water is not a vested, compensable right because it is held in common with the public. *Id.* Finally, the trial court held that even if Claimants possessed compensable riparian rights affected

by the Government's actions, their claims based on such injury were barred because the Corps' operation of the C&SF Project and the discharge of water into the St. Lucie River were exercises of its dominant navigational servitude. *Id.* at 247-55. The Court of Federal Claims entered partial judgment on the riparian claims and after voluntarily dismissing their remaining claims, Claimants filed this timely appeal. This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

This court reviews the Court of Federal Claims' dismissal of a complaint for lack of jurisdiction and grant of summary judgment without deference. *Samish Indian Nation v. United States*, 419 F.3d 1355, 1363 (Fed. Cir. 2005); *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1362 (Fed. Cir. 2009). When the factual underpinnings of the Court of Federal Claims' jurisdiction are contested, the Court of Federal Claims "may weigh relevant evidence." *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003). This court reviews any findings regarding jurisdictional facts for clear error. *Id.* We first address whether the stabilization doctrine applies and whether any mitigation promises prevented accrual of the takings claims and then determine whether Claimants established any compensable property interests under Florida law.

## I.

## A.

The Fifth Amendment of the United States Constitution ensures that the Government does not appropriate private property for public use without just compensation. *See* U.S. Const. amend. V. Compensable takings of private property can occur not only through the Govern-

ment's physical invasion or appropriation of private property, but also by issuance of regulations that unduly burden private property interests. *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1378 (Fed. Cir. 2008) (citations omitted). When the Government takes property but fails to compensate the owner, the Tucker Act provides jurisdiction to enforce the owner's compensatory right. *See Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000). Claims for compensation under the Tucker Act, which waived the sovereign immunity of the United States, are subject to a strict statute of limitations provision: "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after the claim first accrues." 28 U.S.C. § 2501; *see also Lehman v. Nakshian*, 453 U.S. 156, 161 (1981) ("[L]imitations and conditions upon which the Government consents to be sued must be strictly observed, and exceptions thereto are not to be implied.")

Claims accrue when the events giving rise to the Government's alleged liability have occurred and the claimant is or should be aware of their existence. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988). Claimants filed this suit on November 13, 2006. Because they bear the burden of establishing subject matter jurisdiction, Claimants must demonstrate that they could not have reasonably known the facts fixing the Government's alleged liability prior to November 13, 2000.

Claimants argue that the stabilization doctrine applies in this case and supplants traditional accrual principles. The stabilization doctrine recognizes that determining the exact point of claim accrual is difficult when the property is taken by a gradual physical process rather than a discrete action undertaken by the Govern-

ment such as a condemnation or regulation. *See, e.g.*, *Navajo Nation v. United States*, 631 F.3d 1268, 1273-74 (Fed. Cir. 2011). Claimants maintain that the gradual environmental degradation of the St. Lucie River caused by the Corps' discharges did not stabilize until September of 2004. The Government argues that the stabilization doctrine does not apply because there is no evidence that Claimants' land has been physically invaded by its discharges into the St. Lucie River.

The stabilization doctrine originated in *United States v. Dickinson*, 331 U.S. 745 (1947). In *Dickinson*, a Government-constructed dam impounded water and raised the river pool level in successive stages causing intermittent—and eventually permanent— flooding of the respondents' land. *Id.* at 746-47. The Court discouraged strict application of accrual principles because when a public project gradually results in cumulative damage to private property over a long period of time, it may be difficult to determine the precise date on which the takings claim accrued. Thus, property owners may have difficulty determining when to sue due to the uncertainty of the damage and the risk of res judicata. *Id.* at 748. As the Court explained, "[t]he Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'- when they are born, whether they proliferate, and when they die." *Id.* (citation omitted).

In *Dickinson*, the Supreme Court rejected the Government's contention that the takings claim accrued immediately upon the first inundation of the property because at that point, the frequency and permanency of the flooding were still undeterminable. *See id.* at 749. As the taking was caused by a continuous process, the Court held that accrual of the claim was delayed until the situation had "stabilized" such that the "consequences of

the inundation have so manifested themselves that a final account may be struck." *Id.* The stabilization doctrine is designed to ensure that "when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" *ld.* (citation omitted).

The Court clarified the stabilization doctrine in *United States v. Dow*, stating that "[t]he expressly limited holding in *Dickinson* was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated for public use." 357 U.S. 17, 27 (1958). In *Fallini v. United States*, this court explained

> [f]ollowing *Dow*, the Court of Claims adopted a similarly narrow interpretation of *Dickinson* and the meaning of "stabilization" in the takings context. In *Kabua v. United States*, 546 F.2d 381, 384, 212 Ct.Cl. 160 (1976), the court noted that in *Dow*, the Supreme Court "more or less limited [*Dickinson*] to the class of flooding cases to which it belonged, when the landowner must wait in asserting his claim, until he knows whether the subjection to flooding is so substantial and frequent as to constitute a taking."

56 F.3d 1378, 1381 (Fed. Cir. 1995).

Although claimants are not required to sue when it is still uncertain whether the gradual process will result in a permanent taking, the stabilization doctrine also does not permit a claimant to delay bringing suit "until any possibility of further damage has been removed." *Columbia Basin Orchard v. United States*, 88 F. Supp. 738, 739

(Ct. Cl. 1950). As explained in *Boling*, the "touchstone for any stabilization analysis is determining when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable." 220 F.3d at 1373. The obligation to sue arises once the permanent nature of the Government action is evident, regardless of whether damages are complete and fully calculable. *Goodrich v. United States*, 434 F.3d 1329, 1336 (Fed. Cir. 2006) (internal quotations and citations omitted).

The Corps has released large volumes of polluted non-saline water from Lake Okeechobee into the St. Lucie River for almost eighty years and the environmental effects have been evident since the 1950s. In the 1990s, some Claimants formed the St. Lucie Initiative, Inc. to restore the health and productivity of the St. Lucie River. A 1996 volume of the *Muckraker*, the newsletter of the Initiative, summarized the history of harm to the river. The newsletter described a "massive algae bloom" that had occurred earlier that year, explained that water quality "changed drastically" after construction of canals in the early part of the century and in the 1950's, and that "[n]ot since the decade of 1950-59 has the river been so heavily polluted." S.A. 335-37. The Initiative recognized that the river was polluted with agricultural runoff and that "[t]he ancillary failures of grass beds, benthic life, and fish and wildlife in general are obvious." S.A. 332-33. Regardless of whether the stabilization doctrine applies, Claimants' suit is untimely.

The harms to Claimants' alleged riparian rights from the Corps' operation of the C&SF Project in the 1950s mirrored Claimants' alleged injuries and, therefore, the environmental damage was foreseeable and manifested prior to November 13, 2000.

B.

Claimants now assert that the Government promised to mitigate the damage, thereby delaying accrual of their claims. As explained in *Banks v. United States*, the Government's promises to mitigate damages caused by a continuous physical process delays accrual of a takings claim when the claimant demonstrates that the "'predict-ability [and permanence] of the extent of the damage to the [claimant's] land' was made justifiably uncertain by the Corps' mitigation efforts." 314 F.3d 1304, 1309 (Fed. Cir. 2003) (quoting *Applegate v. United States*, 25 F.3d 1579, 1583 (Fed. Cir. 1994)). In *Applegate*, the Corps proposed plans for a sand transfer plant to rebuild beaches washed away because its Canaveral Harbor project interrupted the littoral flow of sand that had previously replenished the beaches. 25 F.3d at 1580. The landowners eventually sued, alleging a taking by erosion. *Id.* at 1582. This court found that the Corps' periodic promises to restore the sand prevented stabilization of that very gradual physical taking because "the landown-ers did not know when or if their land would be perma-nently destroyed." *Id.* at 1583.

In *Banks*, property owners sued to recover for taking of their property due to gradual erosion of shoreline, as significantly exacerbated due to jetties constructed by the Army Corps of Engineers. 314 F.3d at 1306. This court found that the taking claim did not accrue when the jetties were constructed and the shoreline began to erode at a substantially increased rate, so long as mitigation efforts conducted by the Corps muddied the waters and made the permanence of any taking unclear. *Id.* at 1309-10. The statute of limitations began to run on the prop-erty owners' takings claims when the Corps' reports indicated that erosion was permanent and irreversible. *Id.* at 1310.

To fall within the mitigation doctrine expressed in *Applegate* and *Banks*, Claimants argue that the accrual of their takings claims was delayed by the Corps' "numerous efforts and even more promises to mitigate the damage to the St. Lucie." Appellants' Br. 40. Claimants argue that the owners were "justifiably uncertain about the predictability and permanence of the damage caused by the Corps' dumping of non-saline water into the estuary." *Id.* 40-41. The Claimants' arguments to the trial court referenced only mitigation efforts that commenced in the mid-1990s, so, as the Government notes, these fact-based arguments about earlier mitigation promises are raised for the first time on appeal, and could be considered waived. *Cemex, S.A. v. United States*, 133 F.3d 897, 904 (Fed. Cir. 1998) (holding that this court will not review factual issues raised for the first time on appeal). These arguments also lack merit.

There is no justifiable uncertainty due to the Corps' promises before the 1990s because the Corps neither undertook nor committed itself to any mitigation activities. None of the documents or proposals Claimants interpret as committing the Corps to action actually does so. Claimants' citations to local newspaper articles, declarations by members of the St. Lucie Initiative, and the St. Lucie Initiative's newsletter are not competent evidence of any Corps promises to mitigate damage. Also, the Court of Federal Claims considered the 1970 Corps memorandum by Col. A.S. Fullerton. The memorandum is an internal document reflecting only one Corps official's views regarding a possible method of addressing the Corps' public relations problem due the negative effects of regulatory discharges from Lake Okeechobee. The document did not notify the public of any potential Corps action and did not commit the Corps to any action, unlike

the Corps' mitigation plans and promises in *Applegate* and *Banks*.

The Corps' consideration of potential projects to improve management of waterways in South Florida did not commit it to any mitigation activities. As the trial court noted, neither Plan 6 in the Everglades Reconnaissance report of 1994, which involved sending water southward in a large sheet between two canals, nor the C-44 Reservoir proposed in 1998 ever materialized. *Mildenberger*, 91 Fed. Cl. at 238. The new lake regulation schedule that the Corps adopted in 2000 was solely intended to improve the environmental condition of the lake and did not lessen the need for regulatory discharges. *Id.* The Court of Federal Claims correctly found that the mitigation efforts cited by the Claimants could not resurrect their stale takings claims.

## II.

Additionally, Claimants failed to establish that Florida law recognizes compensable property interests in the riparian rights they allege were injured by the Government. The Court of Federal Claims correctly ruled that Claimants failed to establish compensable property rights to view wildlife or boat, fish, or swim in the waters adjacent to their properties. To determine whether the Government is liable for a compensable taking, the "court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004). If the court concludes that a cognizable property interest exists, it then determines whether the governmental action at issue amounted to a compensable taking of that property interest. *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009). Property interests rely on the law of the state where the

property is located, so Claimants' citations of authorities from states other than Florida are irrelevant. *See, e.g.*, *Preseault v. United States*, 100 F.3d 1525, 1534 (Fed. Cir. 1996) (en banc) (determining property interests requires examination of the law of the state in which the property is located). Because Claimants' alleged exclusive riparian rights are unrecognized under Florida law, we do not reach the issue of whether the release of water from Lake Okeechobee constituted a compensable taking of their property.

Florida law recognizes "several special or exclusive common law littoral rights: (1) the right to have access to the water; (2) the right to reasonably use the water; (3) the right to accretion and reliction; and (4) the right to the unobstructed view of the water." *Walton Cty. v. Stop the Beach Renourishment, Inc.*, 998 So. 2d 1102, 1111 (Fla. 2008). As explained in *Ferry Pass Inspectors' & Shippers' Ass'n v. White's River Inspectors' & Shippers' Ass'n*, "a riparian owner may use the navigable waters and the lands thereunder opposite his land for purposes of navigation and of conducting commerce or business thereon, but such right is only concurrent with that of other inhabitants of the state, and must be exercised subject to the rights of others." 48 So. 643, 645 (Fla. 1909). Rights shared with the public are not compensable if taken, whereas the four exclusive littoral or riparian rights are.

Claimants' alleged riparian rights are not recognized by Florida law. The trial court correctly rejected Claimants' assertion that they have a property right in viewing wildlife in the adjacent waters. *Mildenberger*, 91 Fed. Cl. at 242. Such a right is unsupported by any legal authority. The right to have access to the water refers to physical access to the edge of the water, not access to its full potential, including swimming and viewing wildlife. The right to view the water is intended to prevent obstructions

and does not encompass a right to view aesthetically pleasing water. Although the polluted water allegedly required Claimants to clean their boats, experience fetid odors, witness dead and dying animals, and be exposed to harmful water, Claimants voluntarily dismissed their claims to upland damage. Claims of noxious odors and aerosols resulting from the Corps' discharges do not constitute a physical taking of Claimants' property.

Claimants maintain that additional riparian owners' rights were created by subsequent cases and statutes. Claimants argue that *Board of Trustees of Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc.*, established that "a police power regulation prohibiting swimming, fishing, or boating may be unchallengeable by the public but constitute a taking with respect to a riparian." 272 So. 2d 209, 214 (Fla. 2d. 1973). That case was about the well-established riparian owner's right to accretion and did not set forth any new riparian rights analogous to the ones asserted by Claimants. Claimants also cite Florida statute § 253.141(1) (previously numbered § 197.228 (1983)) describing riparian rights as including "boating, bathing, and fishing." In 1985, however, the Florida Supreme Court held that the statute is only "a tax law" and recognized that "[n]o case has ever held [that section] applicable as property law to riparian rights." *Belvedere Dev. Corp. v. Dep't of Transp.*, 476 So. 2d 649, 652-53 (Fla. 1985) (holding that the statute did not prohibit severance of riparian rights from riparian land).

The trial court also determined that Claimants failed to identify any cases recognizing their compensable interest in having the water adjacent to their properties free of pollution. *Mildenberger*, 91 Fed. Cl. at 246. Two of the primary cases Claimants cite when arguing that pollution of water adjacent to their lands constitutes a taking are

not even takings cases. The first case, *Ferry Pass*, was about a riparian owner's ability to operate a business requiring use of the shoreline and listed "common-law rights" held by owners of land bordering navigable waters, including "the right to have the water kept free from pollution." 48 So. at 645. Second, Claimants rely upon *Harrell v. Hess Oil & Chem. Corp.*, 287 So. 2d 291 (Fla. 1973). *Harrell* is distinguishable from this case because it concerned the pleading standards in class action lawsuits and merely held that riparian owners stated a claim for damages due to the discharge of sand and silt into the navigable creek adjacent to their properties. *Id.* at 295. In the present case, although Claimants may be experiencing the effects of pollution of a greater degree than the public, they are suffering the same injuries. The Court of Federal Claims correctly held that Claimants failed to establish any compensable property interests under Florida law and properly granted summary judgment for the Government.

## CONCLUSION

We affirm the Court of Federal Claims' decision that it lacked jurisdiction over Claimants' takings claims because they were filed outside the six-year limitations period pursuant to 28 U.S.C. § 2501 and Claimants failed to establish any compensable riparian property rights. Because Claimants failed to establish any compensable rights, we need not address whether such rights are subservient to the United States' navigational servitude.

**AFFIRMED**