NATIONAL FOOD & BEVERAGE CO., INC., Plaintiff,

v.

UNITED STATES, Defendant.

No. 10–152L.

United States Court of Federal Claims.

Jan. 23, 2012.

Darrell K. Cherry, Deutsch, Kerrigan & Stiles, LLP, New Orleans, Louisiana, for plaintiff.

Brook B. Andrews, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Ignacia S. Moreno, Assistant Attorney General, and Frank J. Singer and James D. Gette, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This takings case is rooted in the government's efforts to rehabilitate and expand levees in Louisiana after Hurricanes Katrina and Rita. Approximately four months after those storms ravaged the Gulf Coast, the U.S. Army Corps of Engineers ("the Corps") sought and obtained a so-called "Commandeering Order" from Plaquemines Parish which gave the Corps access to the property of National Food & Beverage Co. ("National Food" or "plaintiff"). *See National Food & Beverage Co. v. United States*, 96 Fed.Cl. 258, 260–62 (2010). The Corps employed a contractor to enter upon National Food's land and excavate and remove a large quanti-

ty of clay for use in repairing levees. *Id.* National Food brought suit in this court seeking just compensation for a taking, and in due course the case has been prepared for trial. Now, post-discovery, National Food moves for partial summary judgment on liability in advance of the trial scheduled to commence in six weeks. *See* Pl.'s Mot. for Partial Summary Judgment ("Pl.'s Mot."). Based upon the government's admissions of fact, that motion is granted in part.

## BACKGROUND

In August and September of 2005, Hurricanes Katrina and Rita devastated southern Louisiana, causing over a thousand deaths and the destruction of billions of dollars of property. Part of the infrastructure damaged by the two hurricanes was the system of levees intended to protect New Orleans and other areas from flooding. In the aftermath of the storms, the Corps set about repairing, strengthening, and expanding those levees. This was a major undertaking: the Corps estimated that the initial repairs would require approximately 7 million cubic yards of embanked clay, Pl.'s Reply Mem. on its Mot. for Partial Summary Judgment ("Pl.'s Reply") Ex. 4, at 30 of 106,[1] ECF No. 74-4,[2] and that further protective measures could require as many as 100 million cubic yards, *id.* Ex. 4, at 105–06 of 106, ECF No. 74-4.[3]

The agency identified three methods of acquiring clay to meet this demand. The first was to obtain government-furnished sources, *i.e.*, to locate and acquire land containing clay reserves. Pl.'s Reply Ex. 3 (Corps' Borrow Source Summaries), at 1 of 18, ECF No. 74-3. The second method was to rely on contractor-furnished clay, *i.e.*, to hire a contractor to both obtain suitable clay and use it to repair the levees. *Id.* The third method was to enter into supply contracts, *i.e.*, to pay contractors to deliver clay to a worksite (but not to perform levee repairs themselves). *Id.* Originally the Corps relied upon government-furnished clay and supply contracts to meet its needs. *Id.* Ex. 4, at 26 of 106, ECF No. 74-4; *see also id.* Ex. 4, at 30 of 106, ECF No. 74-4. After the immediate urgency waned, however, the agency used all three sources. *Id.* Ex. 4, at 43 of 106, ECF No. 74-4.

One way the Corps could secure government-furnished clay was through Louisiana's Homeland Security and Emergency Assistance and Disaster Act, La.Rev.Stat. Ann. §§ 29:721–736; *see id.* §§ 29:724(D)(4), 29:727(F)(4). In October 2005, the Corps and Plaquemines Parish ("the Parish") entered into a Cooperation Agreement for Rehabilitation of a Federal Hurricane/Shore Protection Project ("Cooperation Agreement"). Am. Compl. Ex. A, ECF No. 9–1; *see also* Pl.'s Mot. Ex. 1 (Def.'s Resps. to Pl.'s Req. for Admis.), at 3 of 23, ECF No. 63–3. This agreement was subsequently modified in January 2006. Am. Compl. Ex. B (Amended Agreement), ECF No. 9–2; *see also* Pl.'s Mot. Ex. 1 (Def.'s Resps. to Pl.'s Req. for Admis.), at 3 of 23, ECF No. 63–3. Under the Cooperation Agreement, the Parish agreed to commandeer a right-of-way onto any private lands that were needed to supply clay for levee repairs. Am. Compl. Ex. B (Amended Agreement), at 4–5. The Parish would transfer this right-of-way to the

1. Citations to a particular page or pages of an exhibit are to the page or pages appearing on the ECF file corresponding to that exhibit, not to the pages shown on the exhibit itself.

2. Except as specifically otherwise noted, references to exhibits are to depositions of Corps personnel designated as witnesses testifying pursuant to Rule 30(b)(6) of the Rules of the Court of Federal Claims ("RCFC").

3. The density of a given volume of clay varies depending on whether it is *banked, loose,* or *embanked.* Banked clay is measured as it is found in a borrow pit. Pl.'s Reply Ex. 4, at 30 of 106. Loose clay is measured after the clay has

been excavated and loaded onto a truck. *Id.* Ex. 4, at 31 of 106, ECF No. 74-4. And lastly, embanked clay is measured once the clay has been compacted and placed in a levee. *Id.* Ex. 4, at 30–31 of 106, ECF No. 74-4. Regarding the type of clay at issue, "[f]or every cubic yard of embanked clay, approximately 2 cubic yards of clay must be excavated[, measured as placed on a truck.]" Pl.'s Mot. Ex. 2 (Def.'s Resps. to Pl.'s Interrogs.), at 11 of 23, ECF No. 63-3. Pending more detailed proofs at trial, the court has used a ratio of 2:1 for loose to embanked clay, 1.3:1 as a ratio for banked to embanked clay, and 1.5:1 as a ratio for loose to banked clay.

Corps, and the Corps would provide just compensation to the private landowner. *Id.*

The Corps already knew that National Food's property contained clay suitable for use in levees. In 2003, several years before the landfall of Hurricanes Katrina and Rita, the Corps had conducted soil borings on National Food's property in anticipation of an unrelated project. Def.'s Resp. to Pl.'s Statement of Facts to Which There Is No Genuine Issue ("Def.'s Uncontested Facts") at 4, ECF No. 71; *see also* Pl.'s Reply Ex. 4, at 62 of 106, ECF No. 74–4. On January 17, 2006, the Corps asked the Parish to grant the Corps right of entry onto National Food's property pursuant to the Cooperation Agreement. *See* Pl.'s Mot. Ex. 10 (Letter from Linda Labure, Chief, Real Estate Div., Corps, to Benny Rousselle, President, Plaquemines Parish), at 16 of 17, ECF No. 63–6. The Corps prepared a document for the Parish president to execute, entitled "Commandeering Property for Borrow Material; Stockpiling, and Access/Authorization for Entry for Construction, Borrow, Stockpiling and Access" ("Commandeering Order"). *Id.; see also id.* Ex. 9 (Commandeering Order), ECF No. 63–6; Def.'s Uncontested Facts at 2.

The Parish president signed the Commandeering Order on January 26, 2006. Pl.'s Mot. Ex. 9 (Commandeering Order), at 14 of 17, ECF No. 63–6. This order commandeered approximately 77.2 acres of property to "be used for access; to obtain borrow material; and to stockpile or process material for construction." *Id.* Ex. 9 (Commandeering Order), at 13 of 17, ECF No. 63–6. Included in this land was at least 36.2 acres of National Food's property, identified severally as "Myrtle Grove Borrow Pit No. 2" or "Tract P602." *Compare* Def.'s Resp. to Pl.'s Mot. ("Def.'s Opp'n") at 5 n. 5, *with* Pl.'s Reply Ex. 4, at 20 of 106, ECF No. 74–4, Pl.'s Mot. Ex. 1 (Def.'s Resps. to Pl.'s Req. for Admis.), at 5–6 of 23, ECF No. 63–3, *and* Def.'s Uncontested Facts at 4. Although signed in late January 2006, the Commandeering Order was not implemented immediately. The Corps' contractor, Shaw Environmental and Infrastructure, Inc. ("Shaw"), entered plaintiff's property about four months later, on or slightly before June 1, 2006. Pl.'s Reply Ex. 12, at 7 of 8, ECF No. 74–12. Shaw began excavating clay on June 13, 2006, *see id.* Ex. 12, at 2–3 of 8, ECF No. 74–12, and continued for a period of approximately nine months, *see id.* Ex. 4, at 10–11 of 106, ECF No. 74–4. Shaw transported the clay to the Buras Levee (approximately 23 miles from plaintiff's property, *see* Pl.'s Reply at 27), where it was compacted and emplaced by Shaw per its contract with the Corps. Pl.'s Mot. Ex. 5, at 11 of 19, ECF No. 63–4. Shaw removed its equipment and vacated plaintiff's property after July 1, 2007. *See* Pl.'s Reply Ex. 12, at 4 of 8. The Corps' use of National Food's property may have extended into September 2007. *See* Pl.'s Mot. Ex. 1 (Def.'s Resps. to Pl.'s Req. for Admis.), at 7 of 23, ECF No. 63–3.

During this same time period, the Corps also pursued contractor-furnished and supply-contract sources of clay. Pl.'s Mot. Ex. 11, at 23, 41 of 92, ECF No. 63–7. In early 2006, the agency issued solicitations for several Indefinite Delivery Indefinite Quantity contracts for clay. Pl.'s Mot. Ex. 2 (Def.'s Resps. to Pl.'s Interrogs.), at 11 of 23, ECF No. 63–3. Between January 4, 2006, and June 30, 2006, it awarded three contracts for the delivery of clay to sites in Plaquemines Parish. *Id.* Ex. 2, (Def.'s Resps. to Pl.'s Interrogs.), at 12 of 23, ECF No. 63–3. Under these contracts, the Corps paid prices ranging from $21.82 to $29.00 per cubic yard, which included "excavation, processing, transport, and delivery" of the clay. *Id.* Ex. 2 (Def.'s Resps. to Pl.'s Interrogs.), at 14 of 23, ECF No. 63–3. Contemporaneously, the Corps entered into three other supply contracts to acquire clay for sites in the neighboring St. Bernard Parish at $25.00 per cubic yard. *Id.* Ex. 2 (Def.'s Resps. to Pl.'s Interrogs.), at 12–13 of 23, ECF No. 63–3. The Corps issued task orders against these contracts before or during the earliest time Shaw was on National Food's property to excavate clay. *See* Pl.'s Mot. Ex. 7, at 47 of 57, ECF No. 63–5.

## PROCEDURAL HISTORY

National Food filed a complaint in the Court of Federal Claims on March 9, 2010,

and amended its complaint on July 20, 2010. *See* Am. Compl. The company raises alternative claims for relief. First, National Food asserts a Fifth Amendment takings claim, alleging that the Corps and its agent occupied its land and removed its clay without providing just compensation. Alternatively, National Food argues that it is the third party beneficiary of the Cooperation Agreement and thus is entitled to the compensation promised by the federal government in that Agreement. Am. Compl. at 26–27.

Six months after this case was instituted, on September 14, 2010, the government filed a Complaint in Condemnation in the United States District Court for the Eastern District of Louisiana against some of the land at issue in this case. *See* Compl. in Condemnation at 1, *United States v. 46.26 Acres of Land, More or Less,* Civ. No. 10–3062 (E.D.La. filed Sept. 14, 2010).

On September 3, 2010, the government had filed a motion to dismiss plaintiff's taking claim, and on September 30, 2010, it filed a motion to stay proceedings. In its motion to dismiss, the government argued that it bore no liability under the Fifth Amendment since it had not taken over National Food's property; rather, Plaquemines Parish was liable, since it had actually commandeered plaintiff's land. *National Food,* 96 Fed.Cl. at 263. In its second motion, the government sought to stay proceedings pending the outcome of the condemnation action it had filed in the Eastern District of Louisiana. *Id.* at 267. Because that condemnation also addresses National Food's property, albeit not precisely the same property as that at issue in this case, the government expressed concern that litigating both suits simultaneously could result in duplicative effort and divergent outcomes. *Id.*

In an opinion issued December 16, 2010, the court denied both of the government's motions. *See National Food,* 96 Fed.Cl. at 269. The court was unimpressed by the government's attempt to hide behind the Parish's Commandeering Order. It found that plaintiff's complaint alleged an "undertaking [that] was overwhelmingly an effort of the federal government, in which the parish had a very limited role." *Id.* at 266. The court

also determined "that this court and the district court [we]re considering distinct and separate takings which address land that overlaps only in part, occurred at different times, and involve entirely separate operative facts." *Id.* at 268.

Over the past year, the parties have been preparing for trial scheduled to commence on February 27, 2012. The motion by National Food for partial summary judgment on liability seeks to streamline and focus that trial to some extent. Specifically, National Food asks the court to (1) determine that National Food possessed a compensable property interest, (2) determine that the Corps inversely condemned that property interest, and (3) rule on the methodology for calculating just compensation. *See* Pl.'s Mot.

## STANDARD FOR DECISION

A court should grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). Only disputes over "facts that might affect the outcome of the suit" will preclude a summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Mere denials, conclusory statements, or evidence that is simply colorable or not significantly probative are insufficient by themselves to force a case to trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ The moving party bears "the initial responsibility of identifying the legal basis of its motion, and of pointing to those portions of the record that it believes demonstrate the absence of a genuine issue of material fact." *Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1046 (Fed.Cir.2001) (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548). Once the movant makes this showing, the burden shifts to the nonmoving party to identify specific facts demonstrating that there is a dispute over material facts. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The court must resolve all issues in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If no rational trier of fact could find for the non-moving party, summary judgment is appropriate. *Id.*

## ANALYSIS

### A. *National Food's Property Interests*

 Although the government concedes that National Food owns the land in question and thus had the right to bar others from occupation of the land, it hints that plaintiff may not be the rightful owner of the clay underlying its land. *See* Def.'s Uncontested Facts at 1. A compensable property interest is, of course, a *sine qua non* in any taking action. *See Mildenberger v. United States,* 643 F.3d 938, 948 (Fed.Cir.2011) (quoting *American Pelagic Fishing Co. v. United States,* 379 F.3d 1363, 1372 (Fed.Cir.2004)). Before considering whether the government's act constituted a taking, the court must satisfy itself that plaintiff actually possessed a compensable property interest. *Mehaffy v. United States,* 102 Fed.Cl. 755, 762 (2012) (quoting *Chancellor Manor v. United States,* 331 F.3d 891, 901 (Fed.Cir. 2003)). The existence vel non of such an interest is determined according to the laws of the state in which the land is located, here, Louisiana. *Mildenberger,* 643 F.3d at 948 (citing *Preseault v. United States,* 100 F.3d 1525, 1534 (Fed.Cir.1996) (en banc)).

The government's hesitation to concede that National Food has a property interest in the clay is based on a clause in the sales agreement between National Food and the property's prior owner, CLL Limited Partnership, Ltd. ("CLL"). *See* Pl.'s Mot. Ex. 8A (Sale Agreement), ECF No. 63–6. The agreement transfers title to the property to National Food "subject to the reservation by [CLL] ... of all oil, gas and other materials in or under the property." *Id.* Ex. 8A (Sale Agreement), at 7 of 17, ECF No. 63–6. The government suggests that this reservation of "other materials in or under the property" might encompass the clay; in which case, CLL would be the rightful owner of the clay harvested by Shaw for the Corps, not National Food.

 Louisiana courts have generally construed mineral servitude reservations in a manner which least restricts the ownership of the land conveyed, applying, among other things, the principle of ejusdem generis. *See Continental Grp., Inc. v. Allison,* 404 So.2d 428, 431 (La.1981) (citing *McGuffy v. Weil,* 240 La. 758, 125 So.2d 154 (1960), *superseded by statute on other grounds as noted in Brier Lake, Inc. v. Jones,* 710 So.2d 1054, 1057 & n. 2 (La.1998), *in turn also overturned by statute as stated in Louisiana Bureau of Credit Control v. Landeche,* 6 So.3d 935, 937 (La.Ct.App.2009)). Under this canon of construction, "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." *Black's Law Dictionary* 594 (9th ed. 2009). For example, the Supreme Court of Louisiana interpreted a reservation of "iron, coal, and other minerals" to refer only to solid minerals and not gas or oil. *Huie Hodge Lumber Co. v. Railroad Lands Co.,* 151 La. 197, 91 So. 676, 677 (1922). Similarly, the Supreme Court of Louisiana construed a reservation of "mineral, oil and gas rights" to include only fugacious resources and not solid minerals such as sand or gravel. *Holloway Gravel Co. v. McKowen,* 200 La. 917, 9 So.2d 228, 232–33 (1942); *see also River Rouge Minerals, Inc. v. Energy Res. of Minn.,* 331 So.2d 878 (La.Ct.App.1976) (holding that an oil, gas, and mineral lease does not encompass solid minerals such as lignite coal).

 In light of these cases, CLL did not retain the rights to underlying clay when it sold the property to National Food. The reservation clause in the sales agreement employs language akin to that interpreted in the above-cited cases. *Compare* Pl.'s Mot. Ex. 8A (Sale Agreement), at 7 of 17, ECF No. 63–6 ("all oil, gas and other materials"), *with Holloway Gravel,* 9 So.2d at 230 ("mineral, oil and gas rights"), *and Huie Hodge,* 91 So. at 677 ("iron, coal, and other minerals"). No reason arises to give the term "other materials" a broader meaning than has been ascribed to similar phrases by the Louisiana Supreme Court. Consequently, the property sale to National Food included the rights to the clay underneath the land. Under Louisi-

ana law, National Food has a compensable property interest in the clay located on its land.

## B. The Occupation of National Food's Land and Removal of Clay

 Once a court has found that the plaintiff had a compensable property interest, it must "determine whether the governmental action at issue amounted to a compensable taking of that property interest." *American Pelagic*, 379 F.3d at 1372 (citing *Chancellor Manor*, 331 F.3d at 902). This question is relatively straightforward in the context of a physical taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427–32 & n. 5, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). The court need merely decide whether "a direct government appropriation or physical invasion of private property" has occurred. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). If there has been such an invasion—no matter how slight— then the government must provide just compensation to the owner. *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1288 (Fed.Cir.2008) ("The jurisprudence pertaining to physical takings 'involves the straightforward application of *per se* rules.'" (quoting *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 233, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003) (in turn quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002)))); *cf. Ladd v. United States*, 630 F.3d 1015, 1025 (Fed.Cir.2010) ("[P]hysical takings are compensable, even when temporary." (citing *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed.Cir.1991))).

The parties do not dispute the material facts of this case. Indeed, the government expressly admits to many of the key elements of National Food's allegations in its statement of uncontested facts, responses to plaintiff's interrogatories, and responses to plaintiff's request for admissions. *See* Def.'s Uncontested Facts; Pl.'s Mot. Ex. 1 (Def.'s Resps. to Pl.'s Req. for Admis.); Pl.'s Mot. Ex 2 (Def.'s Resps. to Pl.'s Interrogs.). The government concedes that it sent a right-of-entry request to the Parish via letter in January 2006, Pl.'s Mot. Ex. 1 (Def.'s Resps. to Pl.'s Req. for Admis.), at 4–5 of 23, ECF No. 63–3, which "proposed [p]laintiff's land to be the subject of [a] Commandeering Order," Def.'s Uncontested Facts at 3. This letter asked the Parish to authorize the Corps to enter the property for the purposes of acquiring clay. Pl.'s Mot. Ex. 1 (Def.'s Resps. to Pl.'s Req. for Admis.), at 5 of 23, ECF No. 63–3.

The government does not dispute that the Parish executed the order and commandeered over 36 acres of National Food's property. Pl.'s Mot. Ex. 2 (Def.'s Resps. to Pl.'s Interrogs.), at 16 of 23, ECF No. 63–3. It admits that the Corps "authorized its contractor [Shaw] to excavate and process clay from the portion of [p]laintiff's property described in the Commandeering Order." Def.'s Uncontested Facts at 3. Shaw used the clay from National Food's property to repair levees in the Buras district. *Id.* at 3, 6. Lastly, the government concedes that it "intended ... to compensate [p]laintiff, in accordance with federal law and the terms of the Cooperation Agreement." Pl.'s Ex. 1 (Def.'s Resps. to Pl.'s Req. for Admis.), at 4 of 23, ECF No. 63–3. Yet the government has failed to do so thus far.

 Given these agreed facts, it is apparent that the Corps effected a physical taking of National Food's property. *See, e.g.*, Def.'s Opp'n at 5 ("The United States does not dispute, and has never disputed, that it went onto [p]laintiff's property and removed clay."). Although the record does not disclose the exact duration of Shaw's occupation of plaintiff's land, the government admits that the contractor physically invaded the property for approximately a year between the summers of 2006 and 2007. Def.'s Uncontested Facts at 3, 5. During that time, National Food was unable to use its land for its customary purpose, the pasturage of cattle. *See* Def.'s Opp'n at 10; *see also* Am. Compl. Ex. D (Corps' Environmental Assessment). The government also admits to appropriating plaintiff's clay. Again, the amount has not been precisely quantified, but the parties agree that it was approximately 500,000 cubic yards of loose clay. *See* An-

swer ¶ 23 (government's admission that it extracted 303,400 cubic yards of embanked clay from National Food's property).

Based upon the government's admissions and the testimony of the Corps' witnesses testifying under RCFC 30(b)(6), the court concludes that the government is liable for a taking consisting of (1) the occupation of National Food's property from approximately June 1, 2006 to a time in July, August, or September 2007; and (2) the removal of about 500,000 cubic yards of loose clay during that occupation. The parties will be able to present evidence at trial as to the precise duration of Shaw's occupation and the exact amount of clay excavated.

### C. *The Proper Method for Evaluating Damages*

Lastly, National Food asks the court for a summary judgment on the method of valuing the property taken by the government. Specifically, plaintiff requests that the court determine that the date of the valuation is the period of time during which Shaw occupied the land and removed clay from National Food's land and that just compensation for the removal of clay should be calculated on a per-cubic-yard basis. Pl.'s Mot. at 2.

The parties appear to agree on the general principles that will govern this case: namely that compensation should be calibrated to "the highest and most profitable use" of plaintiff's land at the time of the taking, *see Board of Cnty. Supervisors v. United States,* 276 F.3d 1359, 1364 (Fed.Cir.2002) (quoting *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)), and that National Food cannot profit from any increase in value generated by activities within the scope of the government's initial project, *see United States v. Cors,* 337 U.S. 325, 332, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949). They concur on the scope of the Corps' project when it began excavating clay from National Food's land: levee repairs pursuant to the New Orleans to Venice Hurricane Protection Project. *See* Pl.'s Mot. Ex. 16 (government's response to defendant's interrogatories in the condemnation litigation pending before the district court), at 6 of 30, ECF No. 63–9. Yet the two sides differ greatly in the application of these ground rules.

At present, the court lacks the necessary factual predicates to determine how the government's liability should be measured. Suppliers of clay did exist generally in southern Louisiana, and the government contemporaneously purchased clay from those suppliers, but the record does not adequately describe the state of the market for clay before and after Hurricane Katrina. In addition, demand for clay may have been affected by both the Corps' original project and other, separate levee enhancement efforts by the Corps and others working in the area. Accordingly, the court remits all aspects of the determination of damages to trial.

### CONCLUSION

For the reasons stated above, plaintiff's motion for partial summary judgment is GRANTED in part and DENIED in part. The court determines the government is liable under the Fifth Amendment for the temporary occupation of plaintiff's land and the permanent appropriation of plaintiff's clay. The case shall proceed to trial on this basis.

It is so ORDERED.

