WATERMAN, Justice.
This high-profile litigation pits one political subdivision of the State of Iowa against several other political subdivisions. The plaintiff is a municipal waterworks; the defendants are upstream drainage districts and their trustees. The plaintiff provides drinking water to central Iowans and is suing for money damages and other remedies to recover its costs to remove nitrates from Raccoon River water. The case was brought in federal court. Our role is simply to answer the following questions of Iowa law certified by that court.
Question 1: As a matter of Iowa law, does the doctrine of implied immunity of drainage districts as applied in cases such as Fisher v. Dallas County, 369 N.W.2d 426 (Iowa 1985), grant drainage districts unqualified immunity from all of the damage claims set forth in the complaint (docket no. 2)?
Answer: Yes. As explained below, drainage districts have a limited, targeted role—to facilitate the drainage of farmland in order to make it more productive. Accordingly, Iowa law has immunized drainage districts from damages claims for over a century. This immunity was reaffirmed unanimously by our court just over four years ago.
Question 2: As a matter of Iowa law, does the doctrine of implied immunity grant drainage districts unqualified immunity from equitable remedies and claims other than mandamus?
Answer: Yes. Again, Iowa precedent, reaffirmed unanimously by our court just four years ago, recognizes that drainage districts are immune from injunctive relief claims other than mandamus.
Question 3: As a matter of Iowa law, can the plaintiff assert protections afforded by the Iowa Constitution’s inalienable rights, due process, equal protection, and takings clauses against drainage districts as alleged in the complaint?
Answer: No. Although these constitutional clauses are fundamental to our freedom in Iowa, they exist to protect citizens against overreaching government. Generally, one subdivision of state government cannot sue another subdivision of state government under these clauses. And even if they could, an increased need to treat nitrates drawn from river water to meet standards for kitchen tap water would not amount to a constitutional violation.
Question 4: As a matter of Iowa law, does the plaintiff have a property interest that may be the subject of a claim under the Iowa Constitution’s takings clause as alleged in the complaint?
Answer: No, for the reasons discussed in the answer to Question 3.
In the balance of this opinion, we will explain our reasoning behind these answers. We emphasize that our decision does not relate to other matters raised in *53 the federal court litigation, including claims brought under federal law.
I. Background Facts and Proceedings.
To provide context for the certified questions, we adopt this discussion from the federal court’s certification order. See Foley v. Argosy Gaming Co., 688 N.W.2d 244, 246 (Iowa 2004) (“We restrict our discussion to the facts provided with the certified questions.”).[1]
A. The Des Moines Water Works. Plaintiff, the Board of Water Works Trustees of the City of Des Moines, Iowa, also known as the Des Moines Water Works (DMWW), is a municipal water utility under Iowa Code chapter 388 (2015)[2] that provides drinking water to an estimated half-million Iowans in the Des Moines area, both by direct service and wholesale service to other utilities and districts. DMWW obtains its water primarily from the Raccoon and Des Moines Rivers. The Raccoon River drains about 2.3 million acres from portions of seventeen Iowa counties, including Buena Vista, Sac, and Calhoun. It flows approximately 186 miles from its origin in Buena Vista County to its confluence with the Des Moines River, south of downtown Des Moines.
Under the Safe Drinking Water Act (SDWA) as amended in 1996, 42 U.S.C. §§ 300f-300j (2012), DMWW is obligated to meet the maximum contaminant level standards set by the 'Environmental Protection Agency (EPA) in the water it serves to consumers. The SDWA is the key federal law for protecting public water supplies from harmful contaminants.' Section 300g-l, as amended in 1996, directs the EPA to select contaminants for regulatory consideration based on occurrence, health effects, and meaningful opportunity for health risk reduction. 42 U.S.C. § 300g-l(b). F.or each contaminant that the EPA determines requires regulation, the EPA must set a nonenforceable maximum contaminant level goal at a level that avoids known or anticipated adverse health effects and that allows an adequate margin of safety. .Id. § 300g-l(b)(4)(A). The EPA must then set an enforceable standard, a maximum contaminant level (MCL), as close to the goal as is feasible, using the best technology, treatment techniques, or other means available and taking costs into consideration. Id. § 300g-l(b)(4)(B). The maximum contaminant level for nitrate, promulgated, in 2012 and currently in force, is .10 mg/L, close to the equivalent of ten parts per million. See EPA, Table of Regulated Drinking Water Contaminants, http://www.epa.gov/ground-water-and-drinking-water/table-regulated-drinking-water-contaminants- (last visited Jan. 12, 2017). Nitrate is a .soluble ion of nitrogen, found in soil, which only leaves the soil when drawn out by the flow of water. See id. The health risks associated with nitrate contamination in drinking water include blue baby syndrome and potential endocrine disruption impacts. Id.
In its complaint filed' in federal court, DMWW states that from 1995 to -2014, nitrate concentrations in the Raccoon River at the DMWW intake points exceeded the 10 mg/L standard for drinking water at least 1636 days, or twenty-four percent of the time. In 2013 and 2014, the average nitrate concentration in the Des Moines and Raccoon Rivers was 11.98 mg/L, the *54 third highest average in the last forty years. Similarly, in September, October, November, and December 2014, the average nitrate concentration was 11.89 mg/L, 13.23 mg/L, 13.43 mg/L, and 12.56 mg/L, respectively.
DMWW states that it utilizes three water treatment plants to process source water into drinking water. These three treatment plants, the McMullen Plant, the Saylorville Plant, and the Fleur Plant, all draw water from the Raccoon River. DMWW has managed excess nitrates in the source water it processes in several ways. At the Fleur Plant, a fraction of the water undergoes an ion exchange process to remove nitrates and then is blended with filtered water to stay below the EPA’s 10 mg/L standard. In addition to drawing water from the Raccoon River, the McMullen Plant draws water from Crystal Lake, a river-influenced surface water source managed to provide reduced-nitrogen water through natural biologic processes. DMWW also can blend the water from the McMullen Plant with nitrate-free water drawn from a reservoir used as an emergency backup water source. The Saylorville Plant is the only plant operated by DMWW that has a limited capacity to remove nitrates.
Additionally, DMWW has an ion exchange nitrate-removal facility that it operates as needed at a cost of approximately $4000-$7000 per day.[3] DMWW utilized its nitrate removal continuously due to excessive nitrate levels until March 10, 2015. The continuous operation for a total of ninety-six days is the longest in the history of the facility’s operation during the winter season. DMWW states that, due to the age and limited capacity of the existing nitrate-removal facility, it will need to design and construct a new nitrate-removal facility with a flfty-milhon-gallon-per-day capacity at a cost of between $76 million and $183.5 million before 2020. Operation and maintenance costs will be in addition to the initial estimated capital cost.
B. The Drainage Districts. Drainage districts were instituted in Iowa to allow wetlands to be turned into productive farmland. The purpose of drainage districts in Iowa can be traced back to the late 1800s and early 1900s. See Swamp Land Act of 1850, ch. 84, 9 Stat. 519 (codified at 43 U.S.C. §§ 982-984 (2012)); Hatch, Holbrook & Co. v. Pottawattamie County, 43 Iowa 442 (1876); Iowa Const, art. I, § 18 (as amended in 1908). Vast areas of flatland could not be farmed due to inadequate drainage. Iowa Code chapter 468 and Iowa Constitution article I, section 18 govern drainage districts. Drainage districts enable property owners to jointly fund drainage improvements. See Fisher, 369 N.W.2d at 428-29.
The right of a landowner to place tiles in swales or ditches to carry the water from ponds upon and onto lower lands ... is necessary ... in order that low and swampy lands may be reclaimed, and a denial thereof would be productive of incalculable mischief.
Dorr v. Simmerson, 127 Iowa 551, 553, 103 N.W. 806, 807 (1905). To establish a drainage district, at least two landowners must petition for its creation. Iowa Code § 468.6. The affairs of the drainage district are then managed by the county board of supervisors in a representative capacity. See, e.g., id. §§ 468.37, .89, .231, .232, .617. The board determines what improvements are needed. Id. § 468.126(l)(a). If the cost exceeds $50,000, a hearing is required to determine advisability of expenditure, and *55 an appeal is allowed. Id. § 468.126(l)(c). Improvements exceeding a certain amount can be stopped by a majority of landowners in the district through a process called remonstrance. Id. § 468.126(4)(c).
Drainage districts “have only such [limited] power as the legislature grants them.” Reed v. Muscatine Louisa Drainage Dist. #13, 268 N.W.2d 548, 551 (Iowa 1978). Iowa’s legislature concluded drainage from agricultural and other lands shall be presumed to benefit the public:
1. The drainage of surface waters from agricultural lands and all other lands, including state-owned lakes and wetlands, or the protection of such lands from overflow shall be presumed to be a public benefit and conducive to the public health, convenience, and welfare.
2. The provisions of this subchapter and all other laws for the drainage and protection from overflow of agricultural or overflow lands shall be liberally construed to promote leveeing, ditching, draining and reclamation of wet, swampy, and overflow lands.
Iowa Code § 468.2(1)—(2).
The thirteen defendant drainage districts in this case are located in the North Raccoon watershed and the Des Moines Lobe geographic formation. The primary purpose of their drainage infrastructure is to remove water from agricultural lands. Private subsurface tiles convey water to other subsurface tiles, pipe, subsurface ditches, and channels created and maintained by the defendants, which in turn convey water to streams and rivers, and ultimately the Raccoon River.
C. Procedural Background. The defendants filed motions for summary judgment seeking dismissal of DMWW’s federal court complaint on several grounds, including the immunities enjoyed by drainage districts under Iowa law. After the summary judgment motions were briefed and argued, the federal court instructed the parties to meet, confer, and come to an agreement on the identification and description of state law issues that could be certified to the Iowa Supreme Court and also instructed the parties to explain whether they believed these issues should be certified. The parties filed a joint certification report. The parties agreed on the wording of the four questions, but disagreed as to whether the questions should be certified. The DMWW favored certification. The defendants argued against certification as unnecessary because controlling precedent answered the questions.
D. The DMWW’s Claims. DMWW’s complaint alleges ten causes of action: Count I for violation of various federal statutes known as the Clean Water Act; Count II for violation of Iowa Code section 455B.186 (“A pollutant shall not be disposed of by dumping, depositing, or discharging such pollutant into any water of the state.... ”); Count III for public nuisance; Count IV for statutory nuisance; Count V for private nuisance; Count VI for trespass; Count VII for negligence; Count VIII for taking without just compensation in violation of the Fifth Amendment of the United States Constitution as made applicable by the Fourteenth Amendment and article I, section 18 of the Iowa Constitution; Count IX for violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and the due process and equal protection clauses of the Iowa Constitution; and Count X for permanent, prospective injunctive relief.
DMWW essentially argues that the defendants are responsible for the increased nitrate concentrations in the Raccoon River. DMWW alleges it may be forced to construct a new, high-capacity nitrate-removal facility, to comply with the SDWA. DMWW’s state and federal constitutional *56 liability theories are based on its claim that the drainage districts are responsible for the increased level of nitrates in the source water the DMWW must process.
Against this backdrop, we turn to the certified questions, beginning with the threshold issue of whether we should elect to answer them.-
II. Our Discretion to Answer Certified Questions.
The DMWW and the certifying federal court urge us to answer the four certified questions. The drainage districts, however, argue that we should decline to answer the questions on grounds that controlling precedent is determinative. “Iowa Code section 684A.1 allows this court .to answer questions of Iowa law certified to us by a federal court that concludes con-, trolling precedent is lacking when the. answer may be determinative of the. federal proceeding,” Oyens Feed & Supply, Inc. v. Primebank, 808 N.W.2d 186, 188 (Iowa 2011). In Foley, we noted our discretion to answer certified questions that (1) were certified by a proper court, (2) presented questions of Iowa law, (3) “may be determinative of the cause ... pending in the certifying court,” and (4) appeared to the certifying court to have no controlling Iowa precedent. 688 N.W.2d at 246 (quoting Iowa Code § 684A.1 (2003)).
The first three requirements are easily met here: the federal court certified four questions of Iowa law that, if resolved adversely to DMWW, would result in summary judgment dismissing its state law claims. “We do not have a situation where the answers to the questions are fact-dependent or the facts are in conflict. These are pure questions of law.” Iowa Right to Life Comm., Inc. v. Tooker, 808 N.W.2d 417, 427 (Iowa 2011) (citations omitted) (distinguishing, cases declining to answer certified questions that required resolution of factual disputes). It is the fourth requirement that gives us pause because, as the certifying court recognized, we have controlling precedent that resolves the questions in favor-of the drainage districts, assuming that precedent remains good law.
Thes federal court candidly acknowledged in its certification order that if it did not certify the questions, it “would have to reject the thoughtful, creative, novel, and well-argued positions of DMWW as unsupported by Iowa law.” The court concluded that,, given the public importance of the case it described as “one of first impression,” certification was appropriate to enable our court to decide the questions under our state law.
We addressed the quandary of whether to answer certified questions despite controlling precedent in Foley, in which the first certified question asked, “Does the requirement of ‘special injur/ to state a claim for a malicious prosecution action still remain the law of Iowa?” 688 N.W.2d at 246 (emphasis added). John Foley claimed the Argosy casino had wrongfully sued him in Illinois for making false statements. Id. at 245. Argosy voluntarily dismissed its Illinois lawsuit against Foley before trial. Id. Foley then sued Argosy in Iowa district court, alleging that “as a result of the Illinois suit, [his] insurance carrier declined to renew its policies and [he] lost financing on a real estate deal in Sioux City.” Id. at 245-46. Foley also claimed the lawsuit “caused him stress, exacerbating preexisting neck and- back pain.” Id. Argosy removed the action to federal court and moved for summary judgment on grounds that Foley failed to allege a recognized type of “special injury,” such as an arrest or seizure of property, required to recover under Iowa law. Id. at 246. The federal court certified four questions to our court asking whether the *57 harm alleged by Foley was recoverable under Iowa law. Id. We observed that we first recognized the special injury requirement in 1884 and had reaffirmed it in numerous decisions thereafter, most recently four years earlier. Id. at 246-47. Yet we noted Foley invited us to abandon the special-injury requirement. Id. 'at 247. We proceeded to answer the certified questions, stating, “[0]ne may always question whether a precedent is controlling by asking whether it remains the law; it is manifest that we are free to overrule precedents when circumstances warrant.” Id. at 247. We then applied our precedent to answer the certified questions. Id. at 247-49.
As in Foley, the questions certified in this case can be answered by applying long-standing precedent first decided a century ago and reaffirmed repeatedly and as recently as four years ago.- We take the same approach today as we did in Foley. The certifying court here, in its wisdom, defers to our judgment on whether the DMWW states a claim against the drainage districts under Iowa law. Revisiting our state law precedent is our prerogative. See State v. Eichler, 248 Iowa 1267, 1270, 83 N.W.2d 676, 678 (1957) (“If our previous holdings are to be overruled, we should ordinarily prefer to do it ourselves.”). We elect to answer the certified questions.
III. Analysis.
We begin our analysis by reviewing our well-settled precedent limiting judicial relief against drainage districts to mandamus and restricting constitutional challenges by public entities. We next explore our traditional adherence to precedent left intact by the legislature, tempered by our obligation to overrule decisions that are plainly erroneous or rendered obsolete by changing circumstances. We then address whether the DMWW’s claims warrant overruling our prior decisions that recognize broad immunity for drainage districts and limit constitutional challenges by public bodies. We conclude our precedent remains good law, and we answer the certified questions accordingly.
A, Our Controlling Precedent. “Our cases have consistently held that a drainage district is not -susceptible to suit for money damages. It has no corporate existence for that purpose.” Chi. Cent. & Pac. R.R. v. Calhoun Cty. Bd. of Supervisors, 816 N.W.2d 367, 374 (Iowa 2012) (quoting Fisher, 369 N.W.2d at 429). “A drainage district’s- immunity is not based on the doctrine of sovereign immunity; instead, it flows from the fact that a drainage district is an entity with ‘special and limited powers and duties conferred by the Iowa Constitution.’” Id. at 374 (quoting Fisher, 369 N.W.2d at 430).
Drainage districts are created and governed by statute, Iowa Code chapter 468, as authorized under the Iowa Constitution, article I, section 18. Drainage district immunity is premised on their limited purpose, which is “to build and maintain drainage improvements that provide for the ‘drainage and improvement of agricultural and other lands,' thereby making them tillable or suitable for profitable use.’ ” Hardin Cty. Drainage Dist. 55, Div. 3, Lateral 10 v. Union Pac. R.R., 826 N.W.2d 507, 510 (Iowa 2013) (quoting Chi., Milwaukee & St. Paul Ry. v. Mosquito Drainage Dist., 190 Iowa 162, 163, 180 N.W. 170, 170 (1920)). Drainage districts have no other function, power, or purpose. As the certifying court observed, “Drainage districts are something of a collective passive utility system.” The districts have accomplished their original statutory mission; The terrain in much of north central Iowa was too wet or swampy for growing *58 row crops[4] until subsurface drain tiles were installed to “transform these lands into the productive farm land that exists today.” Id. at 508. The drainage districts now have a continuing statutory duty to keep the drains working, that is, to maintain the original capacity of the drainage systems. See Iowa Code § 468.126(l)(a).
We reaffirmed our immunity precedent just four years ago to hold that a railroad could not sue a drainage district for the railroad’s costs incurred repairing underground drainage tile. Chi. Cent. & Pac. R.R., 816 N.W.2d at 378. The tile had collapsed, causing a sinkhole undermining the railroad tracks. Id. at 368. The county board of supervisors, as trustees for the drainage district, owed the statutory duty to maintain drainage improvements in repair. Id. at 373 (citing Iowa Code § 468.126(1)). After the county supervisors failed to fix the sinkhole, the railroad made repairs to the drainage system at its expense and demanded reimbursement. Id. at 369. We held the railroad’s reimbursement claim failed as a matter of law, stating, “We see no reason to abandon our previous holdings that ... mandamus is the proper remedy.” Id. at 374.
This has been our law for over one hundred years. See Gish v. Castner-Williams & Ashland Drainage Dist., 136 Iowa 155, 157, 113 N.W. 757, 757 (1907) (“The drainage district is not such [a] legal entity as is known to or recognized by law as a proper party to adversary proceedings.”); Clary v. Woodbury County, 135 Iowa 488, 495, 113 N.W. 330, 332-33 (1907) (holding drainage district could not be sued for downstream flooding). We have repeatedly affirmed the principle that drainage districts cannot be sued for money damages. See, e.g., Gard v. Little Sioux Intercty. Drainage Dist., 521 N.W.2d 696, 698 (Iowa 1994) (dismissing tort action against drainage district by estates of drowned boaters whose watercraft struck obstruction maintained by district); Nat’l Props. Corp. v. Polk County, 386 N.W.2d 98, 107 (Iowa 1986) (noting “[o]ur cases have consistently held that a drainage district is not susceptible to suit for money damages” (quoting Fisher, 369 N.W.2d at 429)); Miller v. Monona County, 229 Iowa 165, 170, 294 N.W. 308, 310-11 (1940) (holding operation of drainage district could not be declared a nuisance); Bd. of Supervisors v. Dist. Ct., 209 Iowa 1030, 1033, 229 N.W. 711, 712 (1930) (“Nor is the plaintiff entitled to a judgment against said drainage district No. 46. A drainage district is sui generis. It is not a corporation. It cannot sue or be sued.... There can be no judgment at law rendered against a drainage district in any case.”); see also Holler v. Bd. of Supervisors, 304 N.W.2d 441, 442 (Iowa Ct. App. 1980) (“[W]e can find no authority for the plaintiffs’ contention that injury resulting to a lower landowner from the exercise of [duties of the drainage district] should be compensated....”).
In Fisher, homeowners whose basement flooded during heavy rains blamed nearby drainage tile blocked by tree roots and debris. 369 N.W.2d at 427-28. They filed a tort action seeking money damages from the drainage district and the county board of supervisors, alleging negligent inspection and maintenance of the drainage tile line. Id. The district court ruled that neither the drainage district nor the board acting on its behalf could be sued for money damages. Id. at 428. We affirmed, noting the “limited nature of a drainage district’s purposes and powers” as the reason judicial relief is limited to mandamus actions to compel performance of a statutory duty. Id. at 429, 430-31. We reiterated that *59 we have never permitted a drainage district to be sued “for money damages on a tort theory for injury to land within the district” and rejected the plaintiffs’ argument that the legislature’s partial abrogation of sovereign immunity with the-enactment of the Municipal Tort Claims Act, Iowa Code chapter 613A (now codified at Iowa Code chapter 670), opened the door to tort actions against a drainage district. Id. at 429-30. We elaborated,
We do not agree that a drainage district’s immunity from suit in tort must stand or fall with the doctrine of sovereign immunity. Nothing in our prior cases suggests that sovereign immunity was the reason for denial of the right to sue a drainage district for money damages. The language of the cases indicates that, apart from any question of sovereign immunity, a drainage district is merely an area of land, not an entity subject to a judgment for tort damages.
This was never the case with such governmental entities as cities or counties. Even before the enactment of chapter 613A, a city could be sued for torts committed in a proprietary, as opposed to governmental, capacity. In contrast, a drainage district could not be subject to a money judgment in tort under any state of facts.
Id. at 430 (emphasis added) (citation omitted). We expressly held that “a drainage district is not a ‘municipality’ within the meaning of Iowa Code section 613A.1(1). A drainage district is not subject to suit in tort for money damages.” Id.
A decade later, in Gard, we declined to overrule Fisher and rejected an equal protection challenge to drainage district immunity. 521 N.W.2d at 698-99. We affirmed the dismissal of a wrongful-death action arising from a fatal boat accident blamed on an underwater obstruction allegedly maintained by the drainage district. Id. at 697, 699. We. noted after our decision in Fisher, the legislature did not amend the Municipal Tort Claims Act to include drainage districts within the definition of municipalities subject to tort claims. Id. at 698. We “invoked the principle that issues- of statutory interpretation settled by ■ the court and not disturbed by the legislature have become tacitly accepted by the legislature.” Id. Accordingly, we applied the doctrine of stare decisis. Id. The plaintiffs argued this resulted in a violation of equal protection under the Federal and Iowa Constitutions by creating separate classes of victims: (1) persons injured by drainage districts who could not sue; and (2) persons injured by other local government entities who could sue. Id. at 698-99. But we rejected the constitutional challenge, stating, “Because of the limited nature of a drainage district’s purposes and powers, there is a rational basis for the classification.” Id. at 699.
Again in 2012, we reiterated our interpretation of chapter 468 precluding claims for money damages and limiting judicial relief to mandamus. Chi. Cent. & Pac. R.R., 816 N.W.2d at 374. “Suits against drainage districts ‘have been allowed only to compel, complete, or correct the performance of a duty or the exercise of a power by those acting on behalf of a drainage district.’ ” Id. at 378 (quoting Fisher, 369 N.W.2d at 429). We saw “no reason to abandon our previous holdings” particularly given the legislature’s inaction, “indicating its tacit acceptance of mandamus as the appropriate remedy for board inaction.” Id. at 374. Our decision was unanimous, with one justice not participating.
We have long made clear that mandamus is the proper remedy to adjudicate claims that a drainage district is violating a duty imposed by an Iowa statute. See id.; Voogd v. Joint Drainage Dist. No. 3-11, 188 N.W.2d 387, 391 (Iowa 1971) (“A drain *60 once completed is under the supervision of the supervisors, and they can be compelled by mandamus to maintain and keep it in repair.”); State ex rel. Iowa Emp’t Sec. Comm’n v. Des Moines County, 260 Iowa 341, 346, 149 N.W.2d 288, 291 (1967) (holding “[a]n action in mandamus is the proper remedy” to compel drainage district to collect and pay state retirement and social security taxes owing under Iowa Code chapters 97B and 97C).
We have specifically held downstream property owners may not obtain other in-junctive relief from drainage districts. Maten v. Olson, 187 Iowa 1060, 1063-64, 175 N.W. 512, 513-15 (1919) (reversing injunction obtained by downstream property owners against drainage district and holding damages from overflow were not a compensable taking).
Another line of cases holds that political subdivisions, as creatures of statute, cannot sue to challenge the constitutionality of state statutes. See Bd. of Supervisors v. Dep’t of Revenue, 263 N.W.2d 227, 232-34 (Iowa 1978) (“Our cases have uniformly held a county lacks the ability to mount a constitutional attack upon state legislative enactments.” (quoting Warren County v. Judges of Fifth Judicial Dist., 243 N.W.2d 894, 897 (Iowa 1976))); Charles Hewitt & Sons Co. v. Keller, 223 Iowa 1372, 1377, 275 N.W. 94, 97 (1937) (“Counties and other municipal corporations are, of course, the creatures of the legislature ... and may not question that power which brought it into existence....”); McSurely v. McGrew, 140 Iowa 163, 170, 118 N.W. 415, 419 (1908) (“[T]he municipality itself cannot complain of any act of the Legislature diminishing its revenues, amending its charter, or even dissolving it entirely.”); see also In re A.W., 741 N.W.2d 793, 805 (Iowa 2007) (“The county attorney’s authority to act on behalf of either the county or the State is derived from the legislature, and he therefore may not challenge the constitutionality of legislative acts in court while representing the interests of the State,”).
This reasoning readily extends to a public utility such as the DMWW, another creature of statute, and precludes its constitutional challenges to chapter 468, which we have interpreted to provide broad immunity for drainage districts. See Hous. Auth. of the Kaw Tribe of Indians of Okla. v. City of Ponca City, 952 F.2d 1183, 1189-90 (10th Cir. 1991) (holding local housing authority could not bring due process or equal protection challenge against another political subdivision acting under state statute); Village of Arlington Heights v. Reg’l Transp. Auth., 653 F.2d 1149, 1153 (7th Cir. 1981) (“[T]he principle that a municipality may not challenge acts of the state under the Fourteenth Amendment applies ‘whether the defendant is the state itself or another of the state’s political subdivisions.’ ” (quoting City of South Lake Tahoe v. Cal. Tahoe Reg’l Planning Agency, 625 F.2d 231, 233 (9th Cir. 1980))).
In sum, a century’s worth of precedent, including a case our court decided unanimously just four years ago, precludes any remedy against drainage districts other than mandamus. While one can critique the reasoning of specific decisions, as one can criticize any decision this court has made, the overall body of law supporting this proposition is quite weighty and long-established.
B. Stare Decisis. Stare decisis “is a Latin term meaning ‘to stand by things decided.’ ” State v. Miller, 841 N.W.2d 583, 586 (Iowa 2014) (quoting Stare decisis, Black’s Law Dictionary (9th ed. 2009)). “From the very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing that a precedent should be overruled before taking such a step.” *61 McElroy v. State, 703 N.W.2d 385, 394 (Iowa 2005) (quoting Kiesau v. Bantz, 686 N.W.2d 164, 180 n.1 (Iowa 2004) (Cady, J., dissenting) (citing Hildreth v. Tomlinson, 2 Greene 360, 361 (Iowa 1849))). “Courts adhere to the holdings of past rulings to imbue the law with continuity and predictability and help maintain the stability essential to society.” Miller, 841 N.W.2d at 586. As we have repeatedly recognized,
[i]t is of the greatest importance that the law should be settled. Fairness to the trial courts, to the legal profession, and above all to citizens generally demands that interpretations once made should be overturned only for the most cogent reasons.... Legal authority must be respected; not because it is venerable with age, but because it is important that courts, and lawyers and their clients, may know what the law is and order their affairs accordingly.
State v. Liddell, 672 N.W.2d 805, 813 (Iowa 2003) (alteration in original) (quoting Stuart v. Pilgrim, 247 Iowa 709, 714, 74 N.W.2d 212, 215-16 (1956)). Iowans have been able to rely on the immunity of drainage districts in choosing to form and operate those entities.
DMWW urges us to depart from stare decisis here. It relies on cases such as Turner v. Turner, describing “our responsibility to reconsider court-made rules when their continued vitality is questionable.” 304 N.W.2d 786, 787 (Iowa 1981) (“When a rule is of judicial origin, it is subject to judicial change.”); see also Koenig v. Koenig, 766 N.W.2d 635, 646 (Iowa 2009) (abandoning common law distinction between invitees and licensees in premises liability cases). Those decisions, however, did not involve judicial interpretation of statutes. “The rule of stare decisis ‘is especially applicable where the construction placed on a statute by previous decisions has been long acquiesced in by the legislature ....”’ In re Estate of Vajgrt, 801 N.W.2d 570, 574 (Iowa 2011) (quoting Ioiva Dep’t of Transp. v. Soward, 650 N.W.2d 569, 574 (Iowa 2002)). That is exactly what we have here. See Chi. Cent. & Pac. R.R., 816 N.W.2d at 374. We reiterated our reliance on “the venerable principles of stare decisis and legislative acquiescence” in the context of interpreting statutes in Doe v. New London Community School District, stating,
[W]e presume the legislature is aware of our cases that interpret its statutes. When many years pass following such a case without a legislative response, we assume the legislature has acquiesced in our interpretation.
[[Image here]]
... Overall, we think our legislature would be quite surprised to learn if we decided to reverse course and take a different position under the guise of statutory interpretation.
848 N.W.2d 347, 355, 356 (Iowa 2014) (quoting Ackelson v. Manley Toy Direct, L.L.C., 832 N.W.2d 678, 688 (Iowa 2013) (citations omitted)).
Still, the principles of stare decisis and legislative acquiescence in combination “are not absolute,” and we may overrule prior decisions “when error is manifest, including error in the interpretation of statutory enactments.” McElroy, 703 N.W.2d at 395 (quoting Miller v. Westfield Ins. Co., 606 N.W.2d 301, 306 (Iowa 2000)). For example, in McElroy, we reinterpreted the Iowa Civil Rights Act to hold that a plaintiff seeking monéy damages is entitled to a jury trial, overruling Smith v. ADM Feed Corp., 456 N.W.2d 378 (Iowa 1990). McElroy, 703 N.W.2d at 395. Our court was narrowly divided in Smith, with four justices dissenting. Id. at 393-94 (citing Smith, 456 N.W.2d at 387-88 (Carter, J., dissenting)). We observed that the Smith dissent predicted problems result *62 ing from the majority’s interpretation that experience revealed in practice and that subsequent changes in federal law “compounded the problems the dissent foretold.” Id. at 394. By contrast, our prior holdings that the DMWW seeks to overturn were unanimously reaffirmed by our court in 1994 and 2012 without any intervening changes in the law underlying the immunity.
C. DMWW’s Arguments for Revisiting Our Precedent. We next address whether DMWW has provided compelling reasons for overruling our century of precedent interpreting chapter 468 that the legislature has left intact. DMWW raises several arguments in this regard. First, DMWW argues immunity should not apply in a water pollution case in light of the evolution in the understanding of environmental contamination. Second, it contends the enactment of the home rule amendment to our state constitution in 1978 undermines the rationale for the immunity. Third, it claims the nitrate contamination at issue rebuts the public health rationale for drainage districts. Fourth, it points to decisions of other states allowing tort claims against drainage districts. Finally, it argues the immunity is unconstitutional as applied. We address these arguments in turn.
1. The evolution of environmental law. The DMWW notes that none of our drainage district immunity decisions involved a claim for water pollution. According to DMWW, immunity was established decades before the environmental movement raised consciousness about protecting water quality. Thus, the DMWW argues the historical basis for immunity does not apply to pollution claims.
Upon our review, we disagree. Changes in environmental laws have not undermined the basis for the immunity—the limited scope and powers of drainage districts as entities. Our cases, old and new, closed the door to tort claims against drainage districts “under any state of facts.” Fisher, 369 N.W.2d at 430. We applied the immunity in Fisher even though the drainage district in that case breached its statutory duty to maintain and repair the underground drain tile line, causing the recurring floods in the plaintiff homeowner’s basement. Id. at 427-28. We again applied the immunity four years ago, unanimously rejecting a railroad’s reimbursement claim for repairing a blocked tile drain that the drainage district was statutorily obligated to maintain. Chi. Cent. & Pac. R.R., 816 N.W.2d at 374. In both cases, we reaffirmed drainage district immunity even though the harm to the plaintiff resulted from the drainage district’s breach of its statutory duty to repair drain tiles.
Pollution claims do not present a stronger case to impose liability. Chapter 468 imposes no duty on the districts to filter out nitrates. Rather, chapter 468 simply requires drainage districts to maintain drainage systems to keep the water flowing to drain lands. See, e.g., Iowa Code § 468.126(l)(a) (requiring repairs as necessary to “restore or maintain a drainage ... improvement in its original efficiency or capacity”). No provision in chapter 468 authorizes drainage districts to mandate changes in farming practices to reduce fertilizer runoff or to assess farmers for the costs of removing nitrates from waters flowing through agricultural drainage systems. It would therefore seem odd to make an exception to drainage district immunity in this one area.
The defendants’ lack of statutory authority to regulate farmer nitrate use cuts against revisiting our long-standing precedent, which rests upon the limited existence and powers of drainage districts. “Liability follows control.... ” Estate of *63 McFarlin v. State, 881 N.W.2d 51, 64 (Iowa 2016). A party in control of an activity can take precautions to reduce the risk of harm to others. See McCormick v. Nikkei & Assocs., Inc., 819 N.W.2d 368, 374 (Iowa 2012) (“The reason is simple: The party in control of the work site is best positioned to take precautions to identify risks and take measures to improve safety.”); Allison by Fox v. Page, 545 N.W.2d 281, 283 (Iowa 1996) (“The general rule and exceptions reveal a common principle: liability is premised upon control.”); Schlotfelt v. Vinton Farmers’ Supply Co., 252 Iowa 1102, 1113, 109 N.W.2d 695, 701 (1961) (declining to issue injunction in nuisance action for foot traffic entering plaintiffs business because “defendant ... should not be compelled to control its customers and in any event could not do so”); see also Okpalobi v. Foster, 244 F.3d 405, 427 (5th Cir. 2001) (reversing injunction against government officials who “have no power to redress the asserted injuries”); McDaniel v. Bd. of Educ., 956 F.Supp.2d 887, 894 (N.D. Ill. 2013) (rejecting equitable claims against parties who would “lack the power to carry out the injunction”); State v. Lead Indus. Ass’n, 951 A.2d 428, 449-50 (R.I. 2008) (holding public nuisance claim for contamination required proof defendants were in control over the instrumentality causing the alleged nuisance at the time the damage occurred). These basic principles of tort law favor preserving, not abrogating, the immunity for drainage districts.
While attitudes toward the environment may differ today from when the first drainage tiles were placed generations ago, tort claims based on alleged pollution are nothing new. “Tort claims challenging environmental pollution can be traced back to at least the seventeenth century....” Freeman v. Grain Processing Corp., 848 N.W.2d 58, 66 (Iowa 2014) (reviewing history of common law and statutory remedies for pollution). Iowa tort law has allowed nuisance claims to recover for environmental contamination for over a century. See id. at 67 (noting that in Bowman v. Humphrey, 132 Iowa 234, 235-36, 243, 109 N.W. 714, 714-15, 717 (1906), “the plaintiff landowner successfully sued a creamery on a nuisance theory for depositing refuse in a running stream that injured the lower riparian owner”). Those tort claims have coexisted with drainage district immunity, weakening the DMWW’s argument that changes in environmental laws support abrogating that immunity.
In Freeman, we noted “the 1960s and 1970s saw the development of significant statutory approaches to pollution.” 848 N.W.2d at 68. These included the Federal Clean Air Act (CAA) and Clean Water Act (CWA) as well as Iowa Code chapter 455B, the state counterpart to those enactments. See id. at 69-72 (contrasting statutory and common law remedies for pollution). We held the CAA and Iowa Code chapter 455B did not preempt state common law claims by neighboring private property owners against a private corn milling facility. Id. at 63-64, 94. We noted, “[T]he EPA has created a vast regulatory structure to control the emission of air pollutants, including technological standards, health standards, risk levels, and enforcement provisions....” Id. at 68 (quoting Alexandra B. Klass, State Innovation and Preemption: Lessons from State Climate Change Efforts, 41 Loy. L.A. L. Rev. 1653, 1686 (2008)). The same is true for water pollution addressed under the CWA. See Am. Elec. Power Co. v. Connecticut, 564 U.S. 410, 419, 131 S.Ct. 2527, 2535, 180 L.Ed.2d 435, 444 (2011) (“[The CWA] installed an all-encompassing regulatory program, supervised by an expert administrative agency, to deal comprehensively with interstate water pollution.”). Yet this *64 proliferation of,environmental laws has not led us or the legislature to revisit our precedent limiting judicial remedies against drainage districts.
Significantly, Iowa Code section 455E.6 expressly immunizes farmers who comply with fertilizer label instructions from liability for nitrate contamination, including money damage claims or cleanup costs.[5] We defer to the legislature whether to reassess that policy choice. See Galloway v. State, 790 N.W.2d 252, 259 (Iowa 2010) (Cady, J., dissenting) (“[Pjublic policy is best left to our legislative branch of government to decide as representatives of the people.”). With that statutory immunity for nitrate costs on the books, it is difficult to argue our precedents immunizing drainage districts should be overruled. Indeed, because farmers are assessed for the costs of drainage districts, one might characterize state-law nitrate-based claims against drainage districts as a way to get backdoor relief against farmers that the legislature has specifically barred through the front door.
Drainage districts provide a conduit for draining water. In other contexts, the legislature has imposed cleanup obligations on entities operating conduits carrying contaminated water. See, e.g., Iowa Code § 358.16 (providing sanitary districts with the power to provide for sewage disposal); id, § 455B.307 (prohibiting dumping solid waste into any place other than sanitary disposal project); see also id. § 455B.186 (“A pollutant shall not be disposed of by dumping, depositing, or discharging such pollutant into any water of the state ... except ,.. adequately treated sewage .... ”); id. § 455B.173 (instructing agency to set forth water standards for sewage systems and waterworks); Iowa Admin. Code r. 567—62.3 (setting forth treatment standards for publicly owned treatment works and sewage disposal systems). -This indicates our legislature has responded to changing environmental attitudes. Unlike with sanitary districts, the Iowa legislature has not imposed duties on drainage districts to treat contaminants.[6]
*65 “[A] drainage district is a legislative creation which has no rights or powers other than those found in statutes which give and sustain its life.” State ex rel. Iowa Emp’t Sec. Comm’n, 260 Iowa at 345, 149 N.W.2d at 291. Iowa Code chapter 468 empowers drainage districts to
restore or maintain a drainage or levee improvement in its original efficiency or capacity, and for that purpose may remove silt, debris, repair any damaged structures, remove weeds and other vegetable growth, and whatever else may be needed to restore or maintain such efficiency or capacity to prolong its useful life.
Iowa Code § 468.126(l)(u) (emphasis added). An improvement is further defined as “a project intended to expand, enlarge, or otherwise increase the capacity of any existing ditch, drain, or other facility above that for which it was designed.” Id. § 468.126(4). Thus, under the express language of the statute, the drainage district is empowered only to “restore,” “maintain,” or “increase” the flow of water through the drainage system. Id. § 468.126(1), (4). The legislature has not authorized drainage districts to assess costs to redesign existing drainage sys-terns to abate nitrates. This further supports our conclusion that the changing environmental attitudes should not undermine our long-standing precedents limiting judicial relief against drainage districts.
Drainage districts and their trustees have presumably relied on our longstanding precedent recognizing their immunity. One practical result of that reliance is the lack of liability insurance to cover defense costs or indemnify- judgments.[7] Perhaps some citizens would have declined to serve as drainage district trustees if they knew they could face uninsured litigation liability. Public property, including funds in bank accounts necessary for the general purpose of the public entity, is exempt from execution. See Reg’l Util. Serv. Sys. v. City of Mount Union, 874 N.W.2d 120, 127 (Iowa 2016) (applying Iowa Code § 627.18). Chapter 468 contains no mechanism allowing drainage districts to raise taxes to pay off a judgment for pollution costs, and even taxes assessed for a drainage improvement are subject to veto by a majority of landowners. See Iowa Code § 468.126(4)(c). By contrast, other statutes allow cities and counties to raise taxes to pay off judgments.[8] If the legisla *66 ture had intended to allow tort claims against drainage districts, it presumably would have provided a funding mechanism to pay judgments, as it did for cities and counties.[9] The absence of such a provision in chapter 468 reinforces our long-standing interpretation precluding tort claims against drainage districts under any set of facts.
Another reason to decline the DMWW’s invitation to abrogate immunity for pollution claims is the absence of any evidence or argument that drainage districts are the cheapest cost avoider for nitrate contamination. The drainage systems were not designed or intended to filter out nitrates. DMWW does not suggest it would be cheaper for the drainage districts to remove nitrates from multiple locations than for DMWW to remove nitrates from a single location. Economic theory underlying tort law favors placing liability on the party who can avoid the harm at the least cost. See Holtz v. J.J.B. Hilliard W.L. Lyons, Inc., 185 F.3d 732, 743 (7th Cir. 1999) (explaining that rules should be set to impose liability on the party who is the “least-cost avoider”—that is, the party who can avoid the mistake at the lowest price); Beyond the Garden Gate, Inc. v. Northstar Freeze-Dry Mfg., Inc., 526 N.W.2d 305, 310 (Iowa 1995) (noting that imposing liability on the “least cost risk avoider ... minimize[s] the total loss to society” (quoting James J. White & Robert S. Summers, Uniform Commercial Code § 11-5, at 539-40 (3d ed. 1988))); Guido Calabresi, The Costs of Accidents: A Legal and Economic Analysis 135 & n.l (1970) (arguing that the burden of a legal rule should be placed on the party who is best positioned and motivated to avoid the harm in the future). The least-cost avoider for removing nitrates from drinking water may well be the DMWW, which already bears the statutory obligation to provide safe water for its customers under the Safe Drinking Water Act and its Amendments, 42 U.S.C. §§ 300f-300j. The DMWW does not claim otherwise and, indeed, itself at times has lawfully deposited back into the Raccoon River the very nitrates it removed.[10]
The argument has been made that “case-by-case adjudication” by the Iowa courts is superior to “legislatively imposed command and control regulation.” We do not share that view. Affected parties are being subjected to “commands” and “controls” whether these come from a legislature, regulatory agency, or a court,. The difference is that statutes and regulations have been approved by one or more elected branches of government who are responsible to the people. Also, these statutes and regulations usually have been developed by parties with expertise, rather *67 than generalist judges. And they are enacted and published in advance so the public knows what the rules are. Case-by-case adjudication, on the other hand, offers none of those advantages.
The Supreme Court, in a decision holding the CAA supplanted federal common law claims asserted by several states and private parties suing over power plant emissions, compared the institutional competency of courts and regulators in addressing pollution as follows:
It is altogether fitting that Congress designated an expert agency, here, EPA, as the best suited to serve as primary regulator of greenhouse gas emissions. The expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions. Federal judges lack scientific, economic, and technological resources an agency can utilize in coping with issues of this order. Judges may not commission scientific studies or convene groups of experts for advice, or issue rules under notice-and-comment procedures inviting input by any interested person, or seek the counsel of regulators in the States where the defendants are located. Rather, judges are confined by a record comprising the evidence the parties present.
Am. Elec. Power Co., 564 U.S. at 428, 131 S.Ct. at 2539-40, 180 L.Ed.2d at 450 (citation omitted). For all these reasons, we are not persuaded to overrule our precedent in light of heightened environmental concerns.
2. The home rule amendment. The DMWW next argues the enactment of the home rule amendment in 1978 broadened the police powers of county government. That amendment granted counties “home rule power and authority, not inconsistent with the laws of the general assembly.” Iowa Const. art. Ill, § 39A; see also Worth Cty. Friends of Agric., v. Worth County, 688 N.W.2d 257, 265 (Iowa 2004) (recognizing the “superior authority of the General Assembly” (quoting Bechtel v. City of Des Moines, 225 N.W.2d 326, 332 (Iowa 1975))). Iowa Code chapter 468, however, remained unchanged. This case turns on the duties and powers of drainage districts. The county supervisors merely act in a representative capacity as trustees of the drainage districts under chapter 468. Nothing in the home rule amendment broadens the supervisors’ operational authority over drainage districts or gives drainage districts the power to regulate farming practices or water quality. We have repeatedly reaffirmed the immunity of drainage districts well after the enactment of the home rule amendment because drainage districts have limited powers. See Chi. Cent. & Pac. R.R., 816 N.W.2d at 374; Fisher, 369 N.W.2d at 430. Drainage districts lack the broad police powers exercised by counties and other political subdivisions.
Home rule powers can only be exercised in a manner consistent with acts of the general assembly. See Iowa Const, art. Ill, § 39A. A state statute trumps inconsistent local acts. The DMWW’s position that the home rule amendment abrogated drainage district immunity conflicts with chapter 468 as we have interpreted it for over a century. That provides another reason for declining to read into the home rule amendment any intent to overrule our statutory interpretation of chapter 468 immunizing drainage districts.
We also note the home rule amendment prohibits local governments from assessing taxes without legislative authorization. Id. (“Counties ... shall not have power to levy any tax unless expressly authorized by the general assembly”). The legislature has expressly allowed counties to levy taxes to pay off tort judgments. See Iowa *68 Code § 626.24. No such provision allows drainage districts to levy taxes to pay off tort judgments. The legislature has authorized drainage districts to levy taxes solely to construct and maintain drainage systems to drain water. Id. § 468.127. The limited powers of drainage districts have remained unchanged since the enactment of the home rule amendment.
8. Public health. The DMWW also contends that its allegations of nitrate contamination should eliminate the historical immunity of drainage districts because they rebut the statutory purpose of drainage districts to benefit “public health.” It is true that Iowa Code section 468.2 codifies a legislative presumption that the “drainage from agricultural lands ... shall be presumed to be a public benefit and conducive to the public health, convenience, and welfare.” Id. § 468.2(1). We draw a different lesson from that language, however, than DMWW. The legislature having adopted a legislative presumption that drainage districts are beneficial, it is not our role to adopt a different presumption. Further, DMWW disregards two additional benefits of draining lands presumed by the legislature—the public’s “convenience[ ] and welfare.” Id. Drainage districts convert economically unproductive swamps into tillable farmland.
Ultimately, this case is about who pays for nitrate removal from the drinking water that reaches our kitchen faucets. The DMWW does not claim nitrate levels render the Raccoon River unsafe for swimming or fishing. All parties agree the DMWW removes unsafe levels of nitrates from the water it provides to its customers. The resulting cost to its customers, according to defendants, is about one cent per day added to their water bills. The DMWW does not challenge that estimate. It is for the legislature to decide whether to reallocate the costs of nitrate reduction. See In re Estate of Whalen, 827 N.W.2d 184, 194 (Iowa 2013) (declining to change the meaning of a statute in the guise of interpretation and suggesting policy arguments for the change be directed to the legislature).
4. The decisions of other state courts. The DMWW cites decisions from a handful of states allowing private persons to sue drainage districts in tort. None involved claims by a water utility or other public entity. Roark v. Macoupin Creek Drainage Dist., 316 Ill.App.3d 835, 250 Ill.Dec. 358, 738 N.E.2d 574, 579-80 (2000); Gerbers, Ltd. v. Wells Cty. Drainage Bd., 608 N.E.2d 997, 998, 1000 (Ind. Ct. App. 1993); Dougan v. Rossville Drainage Dist., 243 Kan. 315, 757 P.2d 272, 279 (1988); Lezina v. Fourth Jefferson Drainage Dist., 190 So.2d 97, 100 (La. Ct. App. 1966); Landview Landscaping, Inc. v. Minnehaha Creek Watershed Dist., 569 N.W.2d 237, 240 (Minn. Ct. App. 1997); Parriott v. Drainage Dist. No. 6, 226 Neb. 123, 410 N.W.2d 97, 99-100 (1987); Kilburn v. Fort Bend Cty. Drainage Dist., 411 S.W.3d 33, 36-37 (Tex. App. 2013); Holytz v. City of Milwaukee, 17 Wis.2d 26, 115 N.W.2d 618, 625 (1962), superseded by statute as recognized by Milwaukee Metro. Sewerage Dist. v. City of Milwaukee, 277 Wis.2d 635, 691 N.W.2d 658, 677 (2005) (noting the adoption of statute codifying immunity for discretionary functions); see also Ark. State Highway Comm’n v. Steed, 241 Ark. 950, 411 S.W.2d 17, 21 (1967) (granting immunity for tort actions against “improvement districts” but allowing injunctive relief and compensation for taking private property).
In any event, these cases are inapposite because the immunity afforded drainage districts in Iowa is based on special features of drainage districts under Iowa law and specific determinations of our legislature in Iowa Code chapter 468. Fisher, 369 N.W.2d at 430. We also have held that *69 drainage districts are not municipalities subject to suit under Iowa’s Municipal Tort Claims Act. Id. That other states permit tort claims against drainage districts does not persuade us to overrule our holdings to the contrary.
5. The constitutionality of broad immunity for drainage districts. The DMWW lastly argues broad immunity in favor of drainage districts is unconstitutional. We have confronted this argument before. In Gard, we applied the rational-basis test[11] and rejected state and federal equal protection challenges to drainage district immunity from tort liability. 521 N.W.2d at 698-99. We denied recovery to the families of two boaters who died when their watercraft struck an underwater concrete deflector jointly maintained by the drainage district in the Little Sioux River. Id. at 697. We are not persuaded the DMWW’s claims over the cost of treating drinking water are more compelling than the wrongful-death claims at issue in Gard. We apply Gard to reject the DMWW’s equal protection claims.
We also reject the DMWW’s “takings” claim. The takings clause provides, “Private property shall not be taken for public use without just compensation first being made..,. ” Iowa Const, art. I, § 18 (emphasis added). No private property is involved in this case. To the contrary, we have a dispute among various public subdivisions that only exist by the grace of the Iowa General Assembly.
The drainage districts have not unconstitutionally deprived the DMWW of any property. The Raccoon River is owned by the State of Iowa in trust for the public. See Estate of McFarlin, 881 N.W.2d at 63. The DMWW does not own the water flowing in the Raccoon River, nor was it denied access to that water. “This case involves public water supplies, not private property. There can be no taking of a public resource. ...” Del. Cty. Safe Drinking Water Coal., Inc. v. McGinty, No. 07-1782, 2008 WL 2229269, at *1 n.1 (E.D. Penn. May 27, 2008). In City of Trenton v. New Jersey, the United States Supreme Court rejected a takings claim under the Fifth Amendment, 262 U.S. 182, 191-92, 43 S.Ct. 534, 538, 67 L.Ed. 937, 942-43 (1923). The City of Trenton operated a water utility and challenged the state’s license fee for diverting river water as an unconstitutional taking. Id. at 183, 43 S.Ct. at 535, 67 L.Ed. at 939-40. The Court held that regardless of whether the city’s water treatment facility was a proprietary or governmental function, the city could not assert a takings claim against the state. Id. at 191-92, 43 S.Ct. at 538, 67 L.Ed. at 943; see also City of Hugo v. Nichols, 656 F.3d 1251, 1257 (10th Cir. 2011) (applying City of Trenton and its progeny to hold municipality could not “sue its parent state under a substantive provision of the Constitution”); Bd. of Levee Comm’rs of the Orleans Levee Bd. v. Huls, 852 F.2d 140, 142-43 (5th Cir. 1988) (holding political subdivisions cannot assert just compensation claims against the state).[12] We reach *70 the same conclusion under the Iowa Constitution. If the DMWW, a public entity, cannot assert a takings claim against the state, nor can it assert such a claim against another political subdivision of the state— a drainage district created by state statute.[13]
In Mohan, we concluded downstream private landowners were not entitled to recover eminent domain payments from a drainage district for harm to their private property caused by the water flow. 187 Iowa at 1063-64, 175 N.W. at 513-14; see also Monona, County, 229 Iowa at 169-70, 294 N.W. at 311 (reversing injunction against drainage district to abate nuisance and holding drainage district “cannot create a nuisance while operating within the ambit of powers constitutionally delegated”). The DMWW has no greater right to such payments than a private downstream property owner. We do not require compensation for an alleged regulatory taking when a statute permits the challenged conduct that “substantially advances a legitimate state interest.” Hunziker v. State, 519 N.W.2d 367, 370 (Iowa 1994) (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1024, 112 S.Ct. 2886, 2897, 120 L.Ed.2d 798, 818 (1992)). The legislature has declared that the “drainage of surface waters from agricultural lands ... shall be presumed to be a public benefit and conducive to the public health, convenience, and welfare.” Iowa Code § 468.2(1). We give effect to that legislative presumption. See In re Det. of Geltz, 840 N.W.2d 273, 275-76 (Iowa 2013) (relying on codified legislative findings to interpret statute); State ex rel. Iowa Emp’t Sec. Comm’n, 260 Iowa at 346, 149 N.W.2d at 391 (“In fact the drainage of surface waters from agricultural or other lands, or their protection from overflow, is presumed to be a public benefit and conducive to the public health, convenience and welfare.”).[14] Chapter 468 substantially ad- *71 vanees a legitimate state interest, thereby defeating any regulatory taking claim by the DMWW.
We also conclude the DMWW cannot assert constitutional claims against the drainage districts under the inalienable rights clause of our state constitution. That provision protects the rights of citizens and does not provide a basis for one public entity to sue another over the use of state-owned assets. See City of Sioux City v. Jacobsma, 862 N.W.2d 335, 348-53 (Iowa 2015) (reviewing history and scope of inalienable rights clause of the Iowa Constitution).
The DMWW relies on Gacke v. Pork Xtra, L.L.C., 684 N.W.2d 168 (Iowa 2004), for its constitutional claims. That case is distinguishable as involving constitutional claims raised by private citizens. See id. at 170. Joseph and Linda Gacke had owned their farmstead since 1974. Id. at 170-71. Two decades later, Pork Xtra built hog confinement facilities across the road. Id. at 171. The Gackes filed a nuisance action, and Pork Xtra asserted the statutory immunity for animal feeding operations in Iowa Code section 657.11(2) (1999) as an affirmative defense. Id. The district court struck the defense as an unconstitutional taking and entered judgment in favor of the Gackes on their nuisance theory. Id. We “conclude[d] the statutory immunity cannot constitutionally deprive private property owners of compensation for the decreased value of their property due to the statutory imposition of an easement for the operation of an animal feeding operation as a nuisance.” Id. at 175 (emphasis added). As noted, our takings clause, by its terms, protects private property. We found the evidence sufficient to establish the hog lot interfered with the Gackes’ use and enjoyment of their privately owned homestead. Id. at 180-81. By contrast, the DMWW alleges injury to public waters used by a public utility, rather than any interference with private property.
In Gacke, we further held the immunity was unconstitutional under the inalienable rights clause of the Iowa Constitution, article I, section 1. Id. at 179. We reiterated that provision “was intended to secure citizens’ pre-existing common law rights (sometimes known as ‘natural rights’) from unwarranted government restrictions.” Id. at 176. We concluded the immunity unconstitutionally hindered the Gackes’ private property rights for the benefit of the defendant’s private business operated as a nuisance. Id. at 179.
We have never struck down a statutory immunity under the inalienable rights Clause or as an unconstitutional taking in a dispute between public entities over use of a public resource. We decline to do so here. Nor will we find a due process or equal protection violation in a dispute between public entities. As set forth above, our prior holdings circumscribe the ability of the DMWW, a public utility created by the Iowa legislature, to challenge the constitutionality of the immunity for drainage districts provided in Iowa Code chapter 468. See In re A.W., 741 N.W.2d at 805; Bd. of Supervisors, 263 N.W.2d at 232-34; Keller, 223 Iowa at 1377, 275 N.W. at 97; McSurely, 140 Iowa at 170, 118 N.W. at 419; see also S. Macomb Disposal Auth. v. Township of Washington, 790 F.2d 500, 505 (6th Cir. 1986) (“For the same reasons, a political subdivision of a state cannot challenge the constitutionality of another political subdivision’s ordinance on due process and equal protection grounds.”); *72 Hons. Auth. of Kaw Tribe of Indians of Ohio., 952 F.2d at 1189-90; Village of Arlington Heights, 653 F.2d at 1153; City of New Rochelle v. Town of Mamaroneck, 111 F.Supp.2d 353, 364 (S.D.N.Y. 2000) (“[A] municipal corporation, in its own right, receives no protection from the Equal Protection or Due Process Clauses vis-a-vis its creating state.” (quoting S. Macomb Disposal Auth., 790 F.2d at 505)); City of Evanston v. Reg’l Tramp. Auth., 202 Ill.App.3d 265, 147 Ill.Dec. 559, 559 N.E.2d 899, 907 (1990) (“The reasoning that political subdivisions have only those rights which are conferred on them by the state applies logically to challenges brought under the United States Constitution by political subdivisions not only'to state statutes or other state action bub to the action of other political subdivisions”).
It makes sense to limit litigation between public entities because the people of Iowa foot the bill for both sides. That is why the legislature enacted Iowa Code section 679A.19 to prohibit litigation between state departments, boards, and commissions. Iowa Individual Health Benefit Reins. Ass’n v. State Univ. of Iowa, 876 N.W.2d 800, 811 (Iowa 2016) (citing H.F. 594, 58th G.A., Reg. Sess., explanation (Iowa 1959)). We see no cogent reason to overrule our precedent holding that subordinate public entities cannot challenge the constitutionality of statutes enacted by the legislature that created them.
Even if we regarded the DMWW'as a private entity and accepted its factual allegations as true, no compensable takings claim is alleged under the Iowa Constitution. The DMWW was not denied access to the Raccoon River; rather, it simply must expend additional funds for nitrate removal. The DMWW cites no case supporting the proposition that the presence of nitrates in raw river water above the level allowed for drinking water in homes results in a compensable taking of a riparian landowner’s property right. The cases hold otherwise, See, e.g., Mildenberger v. United States, 643 F.3d 938, 948 (Fed. Cir. 2011) (affirming summary judgment dismissing Fifth Amendment takings claim by riparian owner for water pollution); Ancarrow v. City of Richmond, 600 F.2d 443, 448 (4th Cir. 1979) (holding private marina owner had “no riparian right or other property right which was ‘taken’ by the city’s pollution of the James River”). The DMWW’s claim that putting nitrates into the Raccoon River creates a public nuisance is at odds with its own practice of depositing those nitrates back into the same river. Under the circumstances, it has failed to state an actionable takings claim under the Iowa Constitution.
IY. Conclusion.
For the reasons explained in this opinion, we answer the four certified questions as set forth above.
CERTIFIED QUESTIONS ANSWERED.
■ Mansfield and Zager, JJ., join this opinion.' Cady, C.J., concurs in part and dissents in part. Appel, J., concurs in part and dissents in part, joined by Cady, C.J. Wiggins and Hecht, JJ., take no part.

. We reiterate the certifying court’s disclaimer that no judicial fact-finding has occurred. The factual background is drawn from allegations of the pleadings that were admitted or denied for lack of information.

. All references are to the 2015 Code unless otherwise indicated.

. It is unclear from DMWW's filings whether this nitrate-removal facility is located at one of its water treatment plants or treats water received from all plants. DMWW indicates that its nitrate-removal facility removes nitrates from its finished water.

. It is said that "corn doesn’t like wet feet."

. Iowa Code section 455E.6 provides,
This chapter supplements other legal authority and shall not enlarge, restrict, or abrogate any remedy which any person or class of persons may have under other statutory or common law and which serves the purpose of groundwater protection. An activity that does not violate chapter 45 5B or 459, subchapters II and III, does not violate this chapter. In the event of a conflict'between this section and another provision of this chapter, it is the intent of the general assembly that this section prevails.
Liability shall not be imposed upon an agricultural producer for the costs of active cleanup, or for any damages associated with or resulting from the detection in the groundwater of any quantity of nitrates provided that application has been in compliance with soil test results and that the applicator has properly complied with label instructions for application of the fertilizer. Compliance with the above provisions may be raised as an affirmative defense by an agricultural producer.
Liability shall not be imposed upon an agricultural producer for costs of active cleanup, or for any damages associated with or resulting from the detection in the groundwater of pesticide provided that the applicator has properly complied with label instructions for application of the pesticide and that the applicator has a valid appropriate applicator’s license. Compliance with the above provisions may be raised as an affirmative defense by an agricultural producer.

. The fact the CWA expressly exempts agricultural runoff further undermines the view that changing environmental attitudes warrants revisiting our precedent on drainage district immunity. 33 U.S.C. § 1362(14) (defining "point source” to exclude "agricultural storm water discharges and return flows from irrigated agriculture”). No court or agency to date has ruled agricultural drainage systems constitute point sources regulated under the CWA.

. Other courts have noted that reliance on stare decisis affects decisions whether to purchase liability insurance. See, e.g., State v. Peeler, 321 Conn. 375, 140 A.3d 811, 857 (2016) (Zarella, J., dissenting) (stating courts should evaluate whether overruling precedent would "cause a significant reordering of individual conduct, including risk shifting arrangements such as insurance policies’); City of Chicago v. Beretta U.S.A. Corp., 213 Ill.2d 351, 290 Ill.Dec. 525, 821 N.E.2d 1099, 1144 (2004) (rejecting city's public nuisance claim against firearm manufacturers, noting “the expectations of potential defendants, both business entities and individuals, and their insurers would be upset substantially if an entirely new scheme of liability were imposed”); Crist v. Hunan Palace, Inc., 277 Kan. 706, 89 P.3d 573, 580 (2004) (declining to overrule precedent, noting ”[i]nsureds and insurers alike ha[d] relied upon” the prior decisions); Paige v. City of Sterling Heights, 476 Mich. 495, 720 N.W.2d 219, 228 (2006) (recognizing “where an entire class of individuals or businesses- purchase insurance and another entire class does not in reliance on a decision by this Court, this may be viewed as the sort of reliance that could cause ‘practical real-world dislocations’ ”).

. Iowa Code section 626.24 authorizes cities to levy taxes to pay off judgments, and provides in relevant part,
If no property of a municipal corporation again which execution has issued can be found, or if the judgment creditor elects not to issue execution against such corporation, *66 a tax must be levied as early as practicable to pay off the judgment.
See also Iowa Code § 331.430 (authorizing debt service funded by county to pay judgments). There are no such statutory provisions allowing drainage districts to levy taxes to pay tort judgments.

. As counsel for the DMWW acknowledged at oral argument, further litigation would be required to allocate liability among numerous drainage districts. Such cost sharing could be further complicated by remonstrance petitions objecting to a drainage district’s tax assessments. See Iowa Code § 468.126(4)(c). By contrast, the DMWW can spread its cost of nitrate removal by raising its water rates. The Illinois Supreme Court aptly observed that when "a system already exists for the rational allocation of costs ... there is little reason for a court to impose an entirely new system of allocation.” Beretta U.S.A. Corp., 290 Ill.Dec. 525, 821 N.E.2d at 1145. Moreover, "the legislature is better able to consider [the] need for cost-recovery legislation” in response to an alleged ongoing public nuisance. Id., 290 Ill.Dec. 525, 821 N.E.2dat 1147.

. Iowa Dep’t Nat. Res., National Pollutant Discharge Elimination System (NPDES) Permit No. 7727000, at 3 (May 1, 2015).

. The DMWW argues we should apply strict scrutiny, but fails to cite any authority applying strict scrutiny to a constitutional claim asserted by one public entity against another, Strict scrutiny is unwarranted when reviewing claims challenging a state's allocation of authority among political subdivisions. Herriman v. Bell, 590 F.3d 1176, 1191 (10th Cir. 2010); Green v. City of Tucson, 340 F.3d 891, 902-03 (9th Cir. 2003).

. The Court's later holding in Gomillion v. Lightfoot does not undermine City of Trenton's application here. Gomillion, 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110, 116-17 (1960) (allowing racial gerrymandering challenge to state statute altering boundaries of city), Gomillion stated that the analysis of City of Trenton and its progeny was confined to "the particular prohibitions of the Constitution considered in those cases.” Gomillion, *70 364 U.S. at 344, 81 S.Ct. at 128, 5 L.Ed.2d at 115. City of Trenton specifically dealt with the takings clause, at issue in this case. Thus, Gomillion did not narrow City of Trenton in a way relevant to our analysis. More recently, the Supreme Court approvingly cited City of Trenton in Ysursa v. Pocatello Education Association when rejecting a challenge to Idaho law banning payroll deductions for political activities for public employees. Ysursa, 555 U.S. 353, 362-63, 129 S.Ct. 1093, 1100-01, 172 L.Ed.2d 770, 779-80 (2009) (noting political subdivisions are subordinate government entities and have "no privileges or immunities under the federal constitution which [they] may invoke in opposition to the will of its creator” (quoting Williams v. Mayor of Baltimore, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015, 1020 (1933))).

. A state political subdivision may have a takings claim against the federal government because the federal government is a separate sovereign. United States v. 50 Acres of Land, 469 U.S. 24, 31, 105 S.Ct. 451, 455-56, 83 L.Ed.2d 376, 383 (1984) (concluding that property held by local government could be considered "private” property for takings purposes under the Fifth Amendment). Those federal takings cases are inapposite to a takings claim by a political subdivision against the sovereign that created it or another subdivision created by the same state government. See United States v. Carmack, 329 U.S. 230, 242 n.12, 67 S.Ct. 252, 258 n.12, 91 L.Ed. 209, 217 n.12 (1946) (“When ... a sovereign state transfers its own public property from one governmental use to another, ... a like obligation does not arise to pay just compensation for it.”); see also Texas Dep't of Transp. v. City of Sunset Valley, 146 S.W.3d 637, 645 & n.2 (Tex. 2004) (concluding city lacked takings claim against state because state had superior interest in roads and recognizing federal cases inapposite because "[t]he relationship between a city and state, which are not separate sovereigns, is not analogous to that between a federal government and a state").

. We note the legislature did not state that the presumption in section 468.2(1) is rebut-table, as it has expressly provided as to other statutory presumptions. See, e.g., Neighbors v. Iowa Elec. Light & Power Co., 175 N.W.2d 97, 99 (Iowa 1970) (applying Iowa Code section *71 489.15 (1962), which stated “[i]n case of injury to any person or property by any such transmission line, negligence will be presumed ... but this presumption may be rebutted by proof”).